UNITED STATES of America,
Plaintiff–Appellee,

v.

Leon FORD, Defendant–Appellant.

No. 01–2158.

United States Court of Appeals,
Sixth Circuit.

Aug. 1, 2003.

Before KEITH, BATCHELDER, and CLAY Circuit Judges.

KEITH, Circuit Judge.

On appeal, Defendant–Appellant, Leon Ford appeals his conviction on a jury verdict of guilty to bank robbery and firearms charges. Specifically, Ford raises two main issues on appeal: (1) that admission of evidence of the stolen vehicle found in his garage violated Fed.R.Evid. 404(b); and (2) that the district court improperly denied his motion to suppress identification evidence due to an eyewitness' viewing and subsequent identification of Ford's photo from what he claims was an "unduly suggestive" photographic lineup.

For the reasons set forth below, we conclude that no abuse of discretion or miscarriage of justice occurred in connection with the admission of this evidence, and AFFIRM the judgment of the district court.

## I. BACKGROUND AND FACTUAL SUMMARY

*Background*

Defendant–Appellant, Leon Ford ("Ford"), appeals from his convictions on

charges of bank robbery and related firearms offenses. On June 21, 2000, a federal grand jury sitting in the Eastern District of Michigan returned a six-count indictment against Ford, charging him with two counts of bank robbery and one count of attempted bank robbery in violation of 18 U.S.C. § 2113(a), and three corresponding counts of using a firearm during and in relation to the three robberies in violation of 18 U.S.C. § 924(c).

The district court denied Ford's pretrial motions to suppress his identification by an eyewitness, and to exclude evidence of the stolen car found in his garage. The jury convicted Ford on charges related to the April 5, 2000 robbery of Comerica bank, the May 10, 2000 robbery of First Federal bank, and related firearms offenses (counts 1, 2, 3, and 4). Ford was acquitted of the charge of attempted robbery of Michigan National bank and the related firearm offense (counts 5 and 6).

The district court also denied Ford's Rule 29 motions and his motion for new trial. On August 2, 2001, the district court sentenced Ford to concurrent terms of 63 months for counts one and three; a consecutive term of 120 months for count two; and a 300 month consecutive term for count four. On August 3, 2001, Ford timely filed a notice of appeal.

*Factual Summary*

This case arose from an investigation into a series of similar "take over" style bank robberies in Detroit, Michigan. The investigation focused on Ford after the FBI interviewed a cooperating witness in June of 2001, but before the bank witness,

Melody Drakes ("Drakes"), identified him. Additionally, the FBI's focus on Ford occurred subsequent to the completion of a composite sketch of the assailant which was based upon descriptive information provided to investigators by Drakes. The indictment charged Ford with the robbery of three banks: Comerica Bank, First Federal Bank, and Michigan National Bank. At trial, Ford stipulated that all three banks were insured federally.

All three robberies occurred in what is known as "take over" style. Such a robbery occurs when the robbers take over the entire scene at a bank, rather than simply demanding that an employee hand over a quantity of money by surreptitiously delivering a "demand note" to a teller. As explained by FBI Special Agent Terry A. Booth, approximately eighty percent of robberies are "demand note" style affairs as opposed to the rare "take over" style perpetrated herein.[1]

*April 5, 2000 Comerica Bank Robbery*

At around 11:00 a.m., on April 5, 2000, a lone gunman with a bandana over his face entered the Comerica Bank branch located on Eight Mile Road and Schaefer in Detroit, Michigan, waving his gun and ordering all inside to "get down, get the f* *k on the ground." The robber ordered one of the tellers to "give me money now or I'm going to kill this b* * *h." The gunman demanded the teller give him "hundreds and fifties, I want hundreds and fifties, and I want more, that's not enough, more." The gunman then fired a shot saying "see what you guys made me do," this fright-

---

**1.** At trial, Agent Booth described the general parameters of a "take over" style robbery as being a robbery where "more than one individual comes in ... and they take over the entire scene. One individual stands in the lobby, watches the customers, looks outside, and makes sure everything is fine ... [mean-while] the other individual or individuals either hop the counter ... and rob the vault, or hit all the tellers and rob all [of them] ... we don't have a lot of takeover robberies. Most of our robberies are done with notes, a 'demand note'." (J.A. at 328).

ened the tellers who presumed that he had shot a customer.

The bank employees described the robber as a fair-complexioned African American man. approximately 5'10" to 6' tall, weighing over 200 pounds. The assailant was wearing a black and white plaid jacket, dark baggy pants, and gym shoes. He also wore a bandana around his face, had on sunglasses and wore a baseball cap adorned with a backward "C". The robber escaped with $6,896.00 in an older model, white vehicle. Police officers recovered bullet fragments and a bullet casing from the floor of the bank.

*May 10, 2000 First Federal Bank Robbery*

On May 10, 2000, also at approximately 11:00 a.m., while opening an account at the First Federal Bank branch located on Joy Road in Detroit, Michigan, Melody Drakes happened to glance through the windows of the bank and observed two suspicious men, one carrying a pistol, entering the bank. They pulled up to the bank in a green vehicle. Drakes got a good look at the armed robber, and testified that she had contact with the individual and that he looked familiar–a short time after, the assailant pulled a bandana over his face and proceeded inside.

In similar fashion to the April 5, 2000 Comerica Bank robbery, the armed robber yelled that a holdup was occurring, ordered the guard to lay down, called the teller a "b* * *h" and ordered her to give him fifties and hundreds. He also yelled at the assistant branch manager, Ella Jackson ("Jackson"), telling her, "b* * *h, get off the phone . . . I want some money." When Jackson left for the vault, he yelled, "don't move, don't move or I'll shoot." Before he approached the second teller, the robber fired his gun into the floor and said "I'm going to shoot another one of these customers," leading Drakes to believe that he had shot her friend and that

he would shoot her next. The robber then said, "give me hundreds and fifties, I don't want any small bills, give me hundreds and fifties . . . give me some more money, b* * *h." he then warned the employees by stating, "I'm not playing with you b* * *hes." The robber and his accomplice subsequently escaped with over $16,000.00. Two blocks from the bank, officers later recovered the getaway car, a green Ford Contour, and discovered that the vehicle was stolen.

Bank witnesses described the robber as a left-handed African American male, aged 25–35 years, standing approximately 6' tall, and weighing between 180–200 pounds. The robber wore sunglasses, baggy pants, dark shoes, and a baseball cap adorned with a backward "C". Police officers later recovered a 9 millimeter Luger shell casing and bullet fragments from the bank floor.

At trial, Drakes positively identified the Defendant–Appellant, Ford, as the armed robber. She also identified him in less than ten seconds when she was shown a photographic lineup one month after the robbery.

*June 8, 2000 Michigan National Bank Robbery*

On June 8, 2000, also at approximately 11:00 a.m., three gunmen burst into the Michigan National Bank branch located on Eight Mile Road in Detroit, Michigan, yelling, "everybody hit the floor." One of the robbers, wearing a plaid shirt, appeared agitated and commanded the lead teller, Jackie Hall ("Hall"), to "give me all of your large bills." She then walked toward the vault, to which one of the robbers responded "this b* * *h thinks we're playing." Hall proceeded to gather together approximately $70,000.00, but upon emerging from the vault discovered that the robbers had fled the scene.

The robbers escaped in a stolen, light blue Plymouth Voyager minivan. Police officers found the minivan less than a mile from the bank with the engine still running. Inside the minivan, officers recovered a gray stripe knit sweater, a black and white plaid shirt, a light blue and a dark blue shirt, a green three quarter length coat, latex gloves, sunglasses, a scarf, a black corduroy shirt, a blue knit shirt, a blue t-shirt, and several other clothing items.

*The Search*

On June 12, 2000, FBI agents executed a search warrant at Ford's home, located at 19319 Blackstone in Detroit, Michigan. They searched Ford's 1988 Oldsmobile Cutlass and several trash receptacles, from which they recovered white gloves, a black bandana, black jeans, and a black t-shirt. In his garage, the agents discovered a stolen 1994 Dodge Shadow.

In Ford's bedroom, agents recovered a loaded Tech–9 submachine pistol, four 9 millimeter cartridges, eight .22 caliber cartridges, and one box each of .22 caliber and .32 caliber cartridges. The agents also found three weapon magazines and several rounds of ammunition on a shelf in the linen closet.

Firearms expert, Sergeant Bruce Karazia ("Karazia"), testified that the discharged shell casing recovered from the floor at First Federal Bank came from the 9 millimeter Luger Tech–9 Submachine pistol recovered from Ford's bedroom.

## II. STANDARD OF REVIEW

Our Court has noted that Fed.R.Evid. 404(b), "is actually a rule of inclusion *rather than exclusion*, since only one use is forbidden and several permissible uses of such evidence are identified." *United States v. Blankenship*, 775 F.2d 735, 739 (6th Cir.1985) (emphasis added). In *Unit-* ed States v. Merriweather, 78 F.3d 1070, 1076–77 (6th Cir.1996), our Court held that the proponent of the other-acts evidence under Rule 404(b) must identify the specific purpose for which the evidence is offered, and the district court must determine: (1) whether this purpose is material, (2) the other alleged criminal acts actually occurred, and (3) if, as required under Fed.R.Evid. 403, the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. After the evidence is admitted, the trial court must instruct the jurors as to the specific purpose for which they may consider the evidence. *Id.* at 1077.

Following the Supreme Court's decision in *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142–43, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997), our Court reviews all evidentiary issues under an *abuse of discretion* standard. *United States v. Mack*, 258 F.3d 548, 553 (6th Cir.2001); *Trepel v. Roadway Express, Inc.*, 194 F.3d 708, 716 (6th Cir. 1999). Furthermore, "a district court is granted 'very broad' discretion in determining whether the danger of undue prejudice outweighs the probative value of evidence." *Mack*, 258 F.3d at 555.

The district court's factual findings in denying motions to suppress are reviewed for *clear error*, and its legal conclusions are reviewed *de novo*. *United States v. Crozier*, 259 F.3d 503, 510 (6th Cir.2001), *cert. denied*, 534 U.S. 1149, 122 S.Ct. 1111, 151 L.Ed.2d 1005 (2002). In assessing the sufficiency of evidence presented in a criminal trial, "all of the evidence is to be considered in the light most favorable to the prosecution." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Reasonable inferences must be permitted from basic facts to ultimate facts, *Jackson*, 443 U.S. at 319, 99 S.Ct. 2781, and it is not necessary that each element of the crime charged be supported

by direct evidence. *United States v. Townsend,* 796 F.2d 158, 161 (6th Cir. 1986). Indeed, "circumstantial evidence alone can sustain a guilty verdict and ... to do so, circumstantial evidence need not remove every reasonable hypothesis except that of guilt." *United States v. Stone,* 748 F.2d 361, 362 (6th Cir.1984). Our Court has held that direct and circumstantial evidence are given the same weight in reviewing an argument concerning the sufficiency of the evidence. *United States v. Prince,* 214 F.3d 740, 746 (6th Cir.2000), *cert. denied,* 531 U.S. 974, 121 S.Ct. 417, 148 L.Ed.2d 322 (2000).

In addition, our Court does not sit to "weigh evidence, make credibility determinations, or substitute [its] judgment for the jury's verdict." *United States v. Crossley,* 224 F.3d 847, 856 (6th Cir.2000). When a defendant challenges the sufficiency of the evidence to support his conviction, "[our Court] must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Lutz,* 154 F.3d 581, 587 (6th Cir.1998).

## III. ANALYSIS

■ We find Mr. Ford's contention that the district court abused its discretion in admitting evidence that law enforcement officers found a stolen vehicle in his garage lacking for two reasons. First, the evidence was properly admitted under Rule 404(b) because it was proof of the *modus operandi* of the crime and was relevant for the purpose of proving identity. This particular article of evidence helped to identify Ford as the robber by illustrating a continuous scheme or plan on the part of a convicted bank robber, and it also proved that Ford had the "opportunity" to commit

a bank robbery as he had access to a stolen car to use as a getaway vehicle.

Second, the disputed evidence was part of the *res gestae* because it was intrinsic to, and necessary to complete the story behind Ford's complicity with regard to the charged offenses. Like the other evidence found during the execution of the search warrant by FBI agents, the car linked Ford to the crimes because it connected him to the signature of the crime—along with the recovered Tech–9 submachine pistol, suspicious clothing, and the use by assailants of a stolen getaway vehicle.

■ We also hold that the district court did not err in making an express finding that any prejudicial effect presented by the introduction of this evidence did not outweigh its probative value. The district court instructed the jury as to the limited purpose of the evidence and, during closing arguments, the Government warned the jury to consider the evidence *only* to connect Ford to the robberies, and not to conclude that he necessarily stole cars.

■ Ford's contention that the district court should have suppressed Drakes' in-court identification of him as the perpetrator, via a photo lineup, because of a "taint" from the photographic array and because of the testimony of his expert witness also fails. In our opinion, the expert's testimony fails because questions of credibility and accuracy regarding Drakes' identification of Ford are factual questions for the jury to resolve, not the district court. Additionally, Drakes' in-court identification of Ford was not tainted by her viewing of a composite sketch of the suspect prior to perusing the photo array, nor could her viewing of the sketch be considered to be "unduly suggestive" in this circumstance. In point of fact, it was Ms. Drakes who indirectly created the sketch to begin with by giving a precise

physical description to the forensic sketch artist involved in the investigation. On this issue, we find that at trial, the sketch was simply employed as a method of refreshing Ms. Drakes' recollection regarding the circumstances at issue.

■ We also believe that Ford fails to demonstrate any clear error on the part of the district court regarding the rejection of his assertion that the other five pictures arranged in the photo lineup contained "suggestive irregularities" which could have influenced Drakes' identification of his photograph. Addressing this issue specifically, the district court found that the photographs all shared "remarkable similarities." and suggested that it would be difficult to envision putting six pictures together that could be considered to be any less suggestive of an outcome. In any event, the jury was given an opportunity to view the photo array which contained Ford's picture along with the five other pictures which he now claims contained suggestive irregularities. Most importantly, the jury itself was properly allowed to draw its own conclusion regarding this evidence.

■ Additionally, we feel that Ford's argument on this issue impermissibly goes to the weight of the evidence, not its admissibility. Even if the photo array was indeed unduly suggestive, the in-court identification was still properly admitted because it was reliable under the "totality of the circumstances" test, as described in *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). Under *Biggers,* a district court must consider: (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation. *Biggers,* 409 U.S. at 199, 93 S.Ct. 375. During the robbery, Drakes had ample time to observe Ford's face; she focused her attention on him because he looked familiar. Additionally, her in-court and prior descriptions were all consistent and matched the bank's own surveillance photos. Drakes contributed to the accurate construction of a composite sketch which Ford himself admits resembled him, and she readily identified Ford from the photo array in less than ten seconds.

■ Lastly, we find Ford's challenge pertaining to the sufficiency of the evidence which implicated him in the April 5, 2000, Comerica Bank robbery and accompanying firearm convictions to be without merit. Specifically, we believe that sufficient evidence was indeed admitted which connected Ford to the May 10, 2000 First Federal Bank robbery and gun charges— the composite sketch presented strongly resembled him. Drakes positively identified him, and Ford was found to be in possession of the weapon used by the assailant during commission of the crime. It is Ford's guilt in the latter robbery which connects him to the former, specifically because both bore the same "signature" or *modus operandi:* both of these heists were conducted in "take over" fashion, the robbers in both crimes used the same distinct language in the same combinations, and the armed robber discharged his weapon and threatened to kill customers during both robberies. Also of note is the fact that the physical description obtained by authorities of the Comerica Bank robber matched the description of Ford obtained during the First Federal robbery. Additionally, in both robberies, the armed assailant was left-handed and wielded his weapon in the same fashion.

In sum, we conclude that the district court committed no abuse of discretion in

the instant case, and that no miscarriage of justice occurred in the jury's conviction of Defendant–Appellant Ford.

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court in all respects.

BATCHELDER, Circuit Judge, concurring in part and dissenting in part.

Although I concur in the result reached by the majority in this case. I respectfully dissent from the majority opinion's holding that the evidence of the stolen car found in the defendant's garage was admissible under Fed.R.Evid. 404(b), but would find that the district court's admission of the evidence constituted harmless error. There is nothing in the record to suggest that the stolen car found in the defendant's garage was used in *any* of the bank robberies for which he was charged, or that he had *any* future plans of robbing another bank let alone with that particular stolen car. Because it was unclear from the evidence in the record if a stolen car had even been used in every one of the bank robberies, the presence of a stolen car found in the defendant's garage, which was unconnected to any charged criminal activity, was insufficient to prove a continuous scheme or plan under Rule 404(b). Additionally, possession of the stolen car was not admissible to show "opportunity" to commit the bank robberies because the ability of the defendant to get a stolen car to use in a bank robbery was never disputed by the defendant, and therefore, was never at issue at trial. Finally, the use of a stolen car in a bank robbery is not unique enough to be considered a "signature"–even when combined with the other evidence recovered from the search of the defendant's residence–to connect the de-

fendant to all of the crimes for which he was charged.

I believe the stolen car evidence was inadmissible under Rule 404(b), but the admission of the evidence, in the context of all the properly admitted evidence presented at trial, amounted to harmless error. Accordingly, I dissent from the majority's holding as to the admissibility of the stolen car evidence but concur in the result reached in Judge Keith's opinion.