**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 07a0706n.06
Filed: October 3, 2007

**No. 06-3116**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | ON APPEAL FROM THE |
| Plaintiff-Appellee, | ) | UNITED STATES DISTRICT |
| | ) | C O U R T   F O R   T H E |
| v. | ) | SOUTHERN DISTRICT OF |
| | ) | OHIO |
| OLIVER MCCOMB, JR., | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| ——————————————————————— | ) | |

BEFORE: KEITH and GRIFFIN, Circuit Judges; and VAN TATENHOVE, District Judge.[*]

GRIFFIN, Circuit Judge.

Defendant Oliver McComb was convicted of six counts of Interference with Commerce by Robbery, in violation of 18 U.S.C. § 1951, and four counts of Carrying a Firearm in Relation to a Crime of Violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii). McComb appeals his convictions, arguing that the government offered insufficient evidence that he affected interstate commerce and that the district court erred in denying his motion to suppress a witness's out-of-court photographic identification of McComb. For the reasons set forth below, we disagree and affirm.

I.

---

[*]The Honorable Gregory F. Van Tatenhove, United States District Judge for the Eastern District of Kentucky, sitting by designation.

On May 10, 2004, a man entered the Family Dollar Store in Columbus, Ohio, and asked the assistant manager, Cathy Jones, about a job application. After Jones directed the man to the front counter, she went to the women's restroom located in the back room of the store. When Jones exited the restroom, the man confronted her and demanded that she give him the store's money. The man told Jones that he had a gun and did not want to shoot her. When Jones tried to escape, the man grabbed her by her neck and attempted to steer her to the store's office. Jones fought back and was eventually able to run to the front of the store and screamed for the cashier to call the police. As the man moved toward the front of the store, he yelled for everybody in the store to get down on the floor because he had a gun and would shoot. The man then fled the store, and the police arrived shortly thereafter.

Two days later, on May 12, 2004, a man wearing a baseball cap entered the Payless Shoe Store located on East Broad Street in Whitehall, Ohio, and approached the manager, Michelle Sharrieff, about a pair of shoes the store had for sale. After Sharrieff responded with the requested information, the man exited and re-entered the store several times throughout the day. After again re-entering the Payless store, the man waited in line at the front counter as Sharrieff checked out customers. After Sharrieff completed a sale with the last customer in line, she knelt down to drop money into the store's safe. The man walked behind the counter and removed the panic button device that Sharrieff wore on her right hip. The man told Sharrieff to give him the money from the safe. Sharrieff observed that the man was carrying a firearm and did as she was told. Sharrieff then laid down on the store's floor, and the man fled out the store's front door.

One week later, on May 19, 2004, a man wearing a black baseball cap and sunglasses entered the Payless Shoe Store on Morse Road in Columbus, Ohio, and approached a store clerk about a pair of boy's Spider Man shoes. The man instructed the clerk to get down behind the front desk and to give him the contents of the cash register. After receiving the money, he left the store. A baseball cap and pair of sunglasses matching the description of the pair worn by the store's robber were later found nearby.

On May 21, 2004, a man wearing a baseball cap and glasses entered the Payless Shoe Store on Cleveland Avenue in Columbus, Ohio, and asked the store's assistant manager, Bethany Byler, whether the store would soon be closing. The man then walked up to the front of the store, showed Byler a gun, and instructed her to empty the cash register. Byler opened the register, and the man picked up the cash drawer, set it out on the front counter, and grabbed all of its money. The man then instructed Byler and the store's other associate to lay on the floor for fifteen minutes and walked out the door with approximately $221. A blue baseball hat matching the description of the hat worn by the suspect was later recovered nearby.

On June 2, 2004, a man wearing a baseball cap entered the Cross Country Inn located on Sinclair Road in Columbus, Ohio, around 7:30 p.m. and asked the Inn's employee, William Braun, for a job application. After Braun told the man that he was out of applications, the man left the Inn. Thirty seconds later, he re-entered. The man walked behind the check-in counter, pushed Braun toward the drive-through window, and told Braun that he had a gun and was robbing the Inn. The man opened and emptied the register, pushed Braun into the restroom, and shut the door before

exiting the Inn. Police officers later discovered a white baseball hat with a teal bill nearby, matching the description of the hat worn by the robber.

The last robbery occurred on June 11, 2004, when a man wearing a baseball cap and sunglasses entered the First America Cash Advance location on East Broad Street in Columbus, Ohio. The man filled out an application until the store's other customers exited. He then approached employee Kenyatta Harris, pulled a gun from his waistband that had been hidden by his shirt, and told Harris to open the register. Harris gave the man $3,000 as he pointed his gun at her. The man then ordered Harris to lie on the floor before he exited.

During the criminal investigation into these robberies, Jones, Sharrieff, Byler, Braun, and Harris all identified defendant Oliver McComb from a photographic array as the person who robbed their respective business. McComb was arrested in connection with the robberies, and later indicted on six counts of Interference with Commerce by Robbery, in violation of 18 U.S.C. § 1951 ("the Hobbs Act"), and four counts of Carrying a Firearm in Relation to a Crime of Violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii). Prior to trial, McComb filed a motion to suppress Sharrieff's identification of McComb. After a hearing and oral argument on McComb's motion, the district court denied the motion.

At trial, Jones, Sharrieff, Byler, and Harris each identified McComb as the assailant. In addition, the government offered evidence that DNA removed from the hats discovered near the Cross Country Inn, the Payless Shoe Store on Cleveland Avenue, and the Payless Shoe Store on Morse Road following the robberies matched DNA taken from McComb. McComb was convicted

on all ten counts of the indictment. With regard to the six counts of Interference with Commerce by Robbery, in violation of 18 U.S.C. § 1951, the district court sentenced McComb to a term of 210 months of imprisonment to be served concurrently. The court then sentenced McComb to a term of 300 months of incarceration for each of the four counts of Carrying a Firearm in Relation to a Crime of Violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii), to be served consecutively to each other and consecutive to the sentence imposed on the § 1951 counts, for a total term of 1,410 months of incarceration. McComb now timely appeals.

## II.

McComb argues primarily that the government failed to offer sufficient evidence that the robberies affected interstate commerce. The government contends that because McComb did not renew a Rule 29 motion at the close of all evidence, he has waived his challenge to the sufficiency of the evidence and that our review is limited to determining whether McComb's conviction amounts to a "manifest miscarriage of justice." In the alternative, the government argues that the evidence at trial was sufficient to demonstrate a *de minimis* connection to interstate commerce, as required by the Hobbs Act.

We agree that McComb has waived his challenge to the sufficiency of the evidence and conclude that McComb's conviction did not result in a manifest miscarriage of justice. We have held repeatedly that

> [t]his Court will not consider challenges to the sufficiency of the evidence if the defendant failed to make a Rule 29 motion for judgment of acquittal at the end of the prosecution's case-in-chief and at the close of the evidence. Failure to make the required motions constitutes a waiver of objections to the sufficiency of the evidence.

*United States v. Chance*, 306 F.3d 356, 368-69 (6th Cir. 2002) (internal citation omitted) (citing *United States v. Dandy*, 998 F.2d 1344, 1356 (6th Cir. 1993)). At the close of the government's case, McComb moved for a directed verdict with regard to the first (count ten) and fifth (count seven) robberies. The district court denied the motion. At the close of all evidence, McComb moved for a directed verdict with regard to the third robbery (count three). The district court denied the motion. Thus, McComb failed to make and renew a Rule 29 motion with respect to any particular count and has waived his challenge to the sufficiency of the evidence. *United States v. Price*, 134 F.3d 340, 350 (6th Cir. 1998).

Because McComb failed to make a Rule 29 motion at the end of the government's case-in-chief and at the close of all evidence, our "review is limited to determining whether there was a manifest miscarriage of justice. A miscarriage of justice exists only if the record is devoid of evidence pointing to guilt." *Id.* at 350 (internal citations and quotations omitted).[1] We find no such miscarriage of justice present here. At trial, the government offered evidence of a common modus operandi connecting the robberies and in-court identifications on the first, second, fourth, and sixth robberies. In addition, the government offered evidence that DNA removed from the hats discovered near the Cross Country Inn, the Payless Shoe Store on Cleveland Avenue, and the Payless Shoe Store on Morse Road following the robberies matched DNA taken from McComb. Moreover, although on appeal McComb states that "the record is devoid of any evidence pointing to McComb's guilt,"

---

[1] At oral argument, counsel for McComb conceded that McComb had failed to preserve his challenge to the interstate commerce requirement, and that the "manifest miscarriage of justice" standard is the appropriate level of review before this court.

he makes no developed argument on this point and fails to explain how his convictions evince a manifest miscarriage of justice. Thus, we conclude that McComb's convictions have not resulted in a "manifest miscarriage of justice."

III.

Even if McComb had preserved his challenge to the sufficiency of the evidence concerning the nexus with interstate commerce, his argument must fail. Where a defendant has properly preserved his challenge to the sufficiency of the evidence offered against him at trial, we determine "whether after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Wang*, 222 F.3d 234, 237 (6th Cir. 2000) (internal citations and quotations omitted).

The Hobbs Act penalizes any person who "obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation" of the Act. 18 U.S.C. § 1951 (a). In order to prevail under the Hobbs Act, "the Government must prove two elements: (1) interference with interstate commerce (2) in the course of a substantive criminal act." *United States v. Ostrander*, 411 F.3d 684, 691 (6th Cir. 2005). As McComb concedes, the law of this Circuit has required only a showing of a *de minimis* connection with interstate commerce to satisfy the Hobbs Act. *See United States v. Davis*, 473 F.3d 680, 681-82 (6th Cir. 2007) (holding that *de minimis* standard survives *Gonzales v. Raich*, 545 U.S. 1 (2005)). Although robbing an individual of money alone may not have a *de*

*minimis* effect on interstate commerce, robbing a business that is engaged in interstate commerce will. *Wang*, 222 F.3d at 240; *see also United States v. Taniguchi*, 49 F. App'x 506, 513 (6th Cir. 2002) (unpublished). Moreover, where the victim of a robbery is a business, the government traditionally satisfies the *de minimis* standard under the "depletion of assets" theory, in which the government "presents evidence that a business is either actively engaged in interstate commerce or customarily purchases items in interstate commerce, and had its assets depleted by the robbery, thereby curtailing the business' potential as a purchaser of such goods." *United States v. Turner*, 272 F.3d 380, 385 n.2 (6th Cir. 2001) (quoting *United States v. Peterson*, 236 F.3d 848, 854 (7th Cir. 2001)).

McComb's claim that the government failed to offer sufficient evidence of a connection with interstate commerce with respect to each robbery clearly lacks merit with respect to robberies one, two, four, five, and six. Cathy Jones, the assistant manager at the Family Dollar store, testified that Family Dollar receives goods from out-of-state and that many of its items sold are manufactured outside of the country. This testimony is sufficient to satisfy the *de minimis* standard under the "depletion of assets theory." *United States v. Turner*, 272 F.3d 380, 385 n.2 (6th Cir. 2001). Michelle Sharrieff, the manager of the Payless Shoe Store on East Broad Street in Columbus, testified at trial that the products sold in Payless are manufactured in China, and that the money stolen from the store would typically have been sent back to Payless headquarters to buy more goods. Bethany Byler, the assistant manager of the Payless Shoe Store on Cleveland Street in Columbus, likewise testified that its goods come from China and other out-of-state manufacturers, and that its

goods travel in interstate commerce to arrive at the store. This testimony satisfies the *de minimis* standard. *See e.g., United States v. Wiley*, 132 F. App'x 635, 641 (6th Cir. 2005) (unpublished) (noting that victim sold Nokia phones that were manufactured overseas). William Braun, an employee at the Cross Country Inn, testified that it receives travelers from throughout the country and that it provides toiletries that are manufactured out-of-state and shipped to the hotel through interstate commerce. This also satisfies the *de minimis* standard. *Id.* at 641 (concluding that interstate commerce requirement is met where victim hotel received guests from throughout the country).

Kenyatta Harris, an employee at First American Cash Advance, testified that First American is a nationwide company that cashes checks and provides short-term loans and cash advances. Harris explained that, in order to receive a cash advance, customers provide two forms of identification, their most recent pay stub, and their most recent bank statement. Harris testified further that First American holds checks for cash, that those checks are usually drawn on nationwide banks such as Bank One or U.S. Bank, and that the cash stolen was used in the course of First American's business to provide change for its customers. This evidence is sufficient to demonstrate a *de minimis* effect on interstate commerce. *See United States v. Nutall*, 180 F.3d 182, 186-87 (5th Cir. 1999) (holding that robbery of nationwide check-cashing company affected interstate commerce in violation of Hobbs Act).

Whether the *de minimis* standard was met with regard to the robbery of the Payless Shoe Store on Morse Road is a closer question. With respect to this third robbery, McComb argues that

the government failed to meet its burden because no witness from the Morse Road store testified regarding that store's connection to interstate commerce. The government contends that the testimony offered by the employees at the other Payless locations is sufficient to satisfy the *de minimis* standard. We agree with the government.

Although no employee from the Morse Road location testified about the store's connection to interstate commerce, Michelle Sharrieff's testimony on this point is applicable to all of the Payless Shoe Stores at issue:

Q:  And how long have you worked for Payless?

A:  Six years.

* * *

Q:  What is your present job?

A:  Manager.

Q:  And how long have you been at the store where you are currently employed?

A:  A little over two years.

* * *

Q:  Ms. Sharrieff, you have worked for Payless for a long time, six years?

A:  Yes.

Q:  Are you familiar with how they acquire their products, where they come from?

A:  Basically, yes.

Q:  Where do they come from?

> A:     Where do they come from?
>
> Q:     Yes.  Are they made here in the United States or made overseas?
>
> A:     Overseas, China.

The first section of Sharrieff's testimony makes it clear that she has worked at multiple Payless locations; although she has worked for the company for six years, she had only been at the Broad Street location for two of those years.  Sharrieff's testimony concerning Payless's acquisition of its goods is based on her knowledge acquired during her six years of employment with Payless – Sharrieff was not asked how and from where the Broad Street location acquires its products, but rather how and from where the Payless Shoe Store company purchases its goods.  Sharrieff's testimony is therefore equally applicable to both the Broad Street and Morse Road locations, and we conclude that her testimony is a sufficient basis upon which a rational juror could conclude that McComb's robbery of the Payless Shoe Store on Morse Road had a *de minimis* effect on interstate commerce.

IV.

Next, McComb challenges his convictions for carrying a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c), arguing that there was insufficient evidence to prove his use of a firearm was in relation to an offense that affected interstate commerce.  As McComb conceded at oral argument, his claim is predicated on the assumption that there was insufficient proof of an effect on interstate commerce in connection with his Hobbs Act convictions; he offers no additional argument or evidence besides that raised in the section of his brief devoted to his Hobbs Act

convictions. Because the government demonstrated a *de minimis* effect on interstate commerce with respect to McComb's Hobbs Act convictions, McComb's convictions pursuant to 18 U.S.C. § 924(c) are affirmed.

We likewise conclude that McComb's argument that the Hobbs Act, 18 U.S.C. § 1951, is unconstitutional as applied to him must fail. This argument similarly relies on the misplaced assumption that the government failed to establish a *de minimis* effect on interstate commerce. In the section of his brief devoted to this argument, McComb merely reiterates his contention that the government failed to prove a *de minimis* effect on interstate commerce. Because we conclude that the government satisfied the interstate commerce nexus, and McComb has offered no additional argument that the Hobbs Act is otherwise unconstitutional, we reject McComb's claim that the Act is unconstitutional as applied to him.

V.

Finally, McComb argues that the district court erred in denying his motion to suppress the out-of-court identification made by Sharrieff. McComb contends that the photo array presented to Sharrieff was impermissibly suggestive because McComb's face is shown in front of a green-colored background while the other faces are in front of a blue background, and because only McComb's picture shows both rows of his teeth. The government responds that these differences in McComb's photo do not make it suggestive and that, in any event, the totality of the circumstances surrounding Sharrieff's identification supports the district court's conclusion. We agree with the district court

that McComb's photo is not impermissibly suggestive, and affirm its denial of McComb's motion to suppress.

The Due Process Clause requires that a conviction based on photograph identification testimony be set aside if "the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968). "A defendant is denied due process 'only when the identification evidence is so unreliable that its introduction renders a trial unfair.'" *United States v. Meyer*, 359 F.3d 820, 825 (6th Cir. 2004) (quoting *Smith v. Perini*, 723 F.2d 478, 482 (6th Cir. 1983)). The defendant bears the burden of demonstrating that the pretrial identification was impermissibly suggestive, *United States v. Hill*, 967 F.2d 226, 230 (6th Cir. 1992), and we review for clear error the denial of a motion to suppress identification. *United States v. Beverly*, 369 F.3d 516, 538 (6th Cir. 2004).

We employ a two-step analysis to address a challenge to a witness photograph identification. *Ledbetter v. Edwards*, 35 F.3d 1062, 1070 (6th Cir. 1994). First, the court determines whether the pretrial identification was unduly suggestive.[2] *Id.* at 1070-71. This is a fact-specific determination, and the court may consider "the size of the [photographic] array, the manner of its presentation by the officers, and the details of the photographs themselves." *United States v. Sanchez*, 24 F.3d 1259,

---

[2]Both parties use the phrase "impermissibly suggestive" rather than "unduly suggestive." This court appears to use the terms "unduly suggestive" and "impermissibly suggestive" interchangeably. *See, e.g., Gregory v. City of Louisville,* 444 F.3d 725 (6th Cir. 2005) (using both phrases); *Grayer v. McKee*, 149 F. App'x 435 (6th Cir. 2005) (unpublished) (same).

1262 (10th Cir. 1994). If the defendant establishes that the identification was unduly suggestive, the court then determines whether the totality of the circumstances surrounding the identification indicates that the identification was nonetheless reliable. The Supreme Court has listed the following factors to weigh in considering the reliability of the witness's identification: "1) the witness's opportunity to view the criminal at the time of the crime; 2) the witness's degree of attention; 3) the accuracy of the witness's prior description of the criminal; 4) the level of certainty demonstrated at the confrontation; and 5) the time between the crime and the confrontation." *Beverly*, 369 F.3d at 539 (citing *Neil v. Biggers*, 409 U.S. 188, 198-200 (1972)).

The district court held a hearing on McComb's motion on December 6, 2004. The court first heard testimony from Detective Dan Kelso from the Whitehall Police Department, who conducted the pretrial identification with Sharrieff. Detective Kelso explained why McComb's picture contained a green background in the identification array:

> Q:    Could you explain to the Court what process you went through in an attempt to put this photo spread together?
>
>                                     * * *
>
> A:    We normally do photo arrays in a couple of a [sic] different ways. One is through BMV photos. I found out that Mr. McComb did not have a BMV photo due to it had been many years since he had an ID or license through Ohio.
>
> The other one is through mug shots that we have taken. I checked with the Franklin County Sheriff's Department and they didn't have a picture. We at the Whitehall Police Department didn't have a current picture. And I went to Columbus and found out that they had an extremely old picture of Mr. McComb that was – it was entered in their system in 1996, but I was told it was probably taken years prior to that.

* * *

Q:   Let me show you what has been marked as Government's Exhibit 9-E. Is this the photograph that you are talking about?

A:   Yes, that's it. Upon seeing that and realizing how old it was, I realized right then that one was insufficient.

* * *

Q:   Now, as of right now, you haven't been able to come up with a picture; is that right?

A:   At this point I wasn't able to come up with a picture until I got on the Prison Offender Website, and I was able to locate a relatively current photo of Mr. McComb. I contacted the Adult Parole Authority, which told me that was the only picture they also had of him. So, at this point in time, it was the only picture I could find.

Q:   And how did you put [the photo identification array] together, then?

A:   What I did was that I got on the website and simply starting typing in last names and going through hundreds of pictures, looking for sufficient people to also put in the array.

Q:   Did you try to match them up to weight, height and size and everything like that?

A:   Yeah, you know, generally. Obviously, the race being the same. You know, we wanted general weight and height, so that there was nothing completely different about the person.

Q:   Now, the background photographic color of Mr. McComb is a little bit off from the rest; is that correct?

A:   Yes. There is a couple of them that are a little bit different.

Q:   At least two or three are a little bit different from each other?

A:     Right.

Q:     Now, did you feel confident when you went and put this together, were you confident that it was something that you felt could be used as an identification tool?

A:     Oh, absolutely.  I mean, in going through the website there, I was finding all kinds of different backgrounds.  So, I couldn't choose – I even found ones with red backgrounds.  So, I wasn't able to actually pick the background.  It wasn't up to me.  I was concerned with the faces in the pictures.

Detective Kelso then described his meeting with Sharrieff, which occurred on June 11, nearly

one month after the robbery:

Q:     Now, based on that, putting [the photo identification array] together, did you call in Michelle Sharrieff to view the photo lineup?

A:      I actually met her at the store to view it.

*  *  *

Q:     This is Exhibit 9-C.  Could you please explain to the Court what I have just handed you?

A:     This is a standard form that the Whitehall Police Department read[s] prior to showing any photo array to a victim or witness.

Q:     And would you please read off there what you read to the lady before you showed her the pictures?

A:     Yes.  I said, "I'm going to show you a group of photographs.  Please take your time to examine all the photographs carefully.  If you recognize any of the photographs, please explain why.  You do not have to select anyone from these photos.  Please keep in mind that hair styles, beards and mustaches are easily changed.  Photographs do not always depict the true complexion of a person, meaning the complexion may be lighter or darker, depending upon the lighting present at the time the photo was taken.  Please do not discuss with other witnesses whether you recognize anyone in these photographs."

Q:     And did you read that to Ms. Sharrieff?

A:     Yes, I did.

Kelso then testified that Sharrieff identified McComb immediately as the man who robbed her.

Next, Sharrieff testified and explained that she recognized McComb because he had exited

and re-entered the Payless Shoe Store several times on May 12, 2004:

Q:     Okay.  Now, when this person first came into your store and walked around, did he ever leave the store?

A:     Occasionally, but then he came back off and on.

Q:     Did you have more than one conversation with him?

A:     Yes, I did because when he came back again, I mentioned that – I just made a comment, you're back again.  You know, if it was any other customer who didn't find anything the first time around, they would usually come back.  And I just said, oh, you're back again.  You know, just a normal comment.

Q:     Did he tell you where he was going or where he had been, things like that?

A:     He mentioned that – well, I mean, he had come back a few times throughout the day.

* * *

The last time I talked to him, he was – you know, when I mentioned that he came back, when I said the comment to him that he was coming back, he was waiting on his wife or daughter, they had went to Petland.  We have a Petland store that is a couple of doors away from my store.  And he was waiting on them until they got done to whatever, looking around the store.

Sharrieff then discussed her pretrial identification of McComb on June 11, corroborating Detective

Kelso's account that Kelso explained that she did not need to identify any person, and that she did

not feel pressured to identify a suspect.

On cross-examination, Sharrieff denied that the green background on McComb's picture

drew her attention to him:

> Q:   So, Oliver McComb's picture has a green background and Oliver McComb's
> picture is the only picture of any of the six individuals with both lower and
> upper teeth showing?
>
> A:   Correct.
>
> Q:   It kind of draws your attention to him at least immediately, would you agree?
>
> A:   Not at first.

After listening to testimony from Detective Kelso and Sharrieff, and considering the parties'

oral arguments, the court denied McComb's motion, explaining:

> Well, the contention is that the photo array presented to the witness was unduly
> suggestive, and counsel has articulated two arguments in support of that contention.
> The first is the different color of the background of the photograph with the
> defendant. And I have looked at this photo array twice now, and I had the same
> impression each time I look at it. All of the photographs are presented with a pastel
> background. I find nothing particularly striking about the background of Mr.
> McComb's photograph. It's essentially the same hue, if you will, as all of the others.
>
> The contention is that it is green. But it is not markedly greener than some of the
> others, and there is nothing about the background that makes his photo stand out. I
> am applying my own subjective standard in looking at it, but I don't know what else
> I can do but to look at it, and it certainly doesn't jump out at me that there is any
> difference.
>
> The other argument is that his photograph is the only one that displays upper and
> lower teeth and that somehow makes it suggestive, but I don't really follow that

argument. I don't know why it would make it suggestive to have both the upper and lower teeth showing. There are teeth showing in two of the other photos, although not the lower. One of the gentlemen has a broad smile just like Mr. McComb. All of his upper teeth, which are quite prominent, are displayed.

And there is no indication here that the witness' identification was somehow based upon the appearance of teeth being displayed. She didn't testify that this individual who came in the store on four occasions and ultimately robbed her prominently displayed his teeth. So, I don't know why the appearance of teeth would be suggestive of anything.

The district court did not clearly err in ruling that the photo identification array was not unduly suggestive. A darker hue or different colored background does not "in [itself] create an impermissible suggestion that the defendant is the offender." *United States v. Burdeau*, 168 F.3d 352, 358 (9th Cir. 1999) (denying challenge to pretrial identification where defendant's "picture was placed in the center of the array, was darker than the rest, and was the only one in which the eyes were closed."); *see also United States v. Mathis*, 264 F.3d 321, 333 (3d Cir. 2001) (holding that "slightly darker" background of defendant's picture "did not significantly contribute to the array's unnecessary suggestiveness"). Detective Kelso provided a reasonable explanation why McComb's picture differed from the other pictures used in the array, and Sharrieff gave no indication that either McComb's teeth or the color of the background drew her attention to the picture. Therefore, we agree with the district court that McComb's photograph was not unduly suggestive and affirm the denial of McComb's motion to suppress.

Moreover, even if we were to conclude that McComb's photo was unduly suggestive, the totality of the circumstances indicates that Sharrieff's identification was sufficiently reliable to pass due process muster. First, Sharrieff testified that at the time of the robbery, McComb was standing

at a distance of three to four feet from her face. Second, Sharrieff testified that she remembered McComb because he exited and re-entered the store several times throughout the day and that she had conversed with him multiple times before the robbery began. Third, Sharrieff testified that on the day of the robbery, McComb was wearing a "brownish-tan tee-shirt, dark-colored pants and . . . a ball cap" and was approximately six feet tall. McComb does not argue on appeal, nor did he argue before the district judge at the suppression hearing, that Sharrieff's description was mistaken. Fourth, Sharrieff testified that when she made the pretrial identification of McComb, she was asked to give a percentage indicating how sure she was that the person she selected was the robber; Sharrieff replied that she was 90 percent sure. Finally, Sharrieff identified McComb in the photo array nearly one month after the robbery occurred. We have held previously that a one month gap between the criminal incident and an identification is a *Biggers* factor in favor of reliability. *Grayer*, 149 F. App'x at 439; *United States v. Ford*, 72 F. App'x 342, 345, 348 (6th Cir. 2003) (unpublished). Furthermore, Sharrieff's identification of McComb is supported by evidence indicating that McComb's fingerprints were found on the panic device that he grabbed from Sharrieff's hip during the robbery.

Because the photo used to identify McComb was not unduly suggestive and all of the *Biggers* factors indicate that Sharrieff's pre-trial identification was reliable, we affirm the district court's denial of McComb's motion to suppress.

VI.

For the reasons set forth above, we affirm McComb's convictions.

- 20 -