NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0468n.06

No. 20-3963

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Oct 14, 2021
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| v. | ) | THE NORTHERN DISTRICT OF |
| | ) | OHIO |
| JOSEPH KYLE SANDERS, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

BEFORE: BOGGS, GRIFFIN, and MURPHY, Circuit Judges.

MURPHY, Circuit Judge. Joseph Sanders robbed a LoanMax in northeast Ohio. He was convicted of interfering with commerce by means of robbery (commonly known as "Hobbs Act" robbery). *See* 18 U.S.C. § 1951(a). Sanders committed this robbery with the help of a minor, which led the district court to apply a use-of-a-juvenile enhancement when sentencing him. *See* U.S.S.G. § 3B1.4. On appeal, Sanders argues that the government presented insufficient evidence that his robbery affected "commerce" within the meaning of the Hobbs Act. Yet the LoanMax relies on an out-of-state lender to lend money, so a reasonable jury could have found that the robbery impeded interstate loans. Sanders alternatively argues that § 3B1.4's use-of-a-juvenile enhancement should not apply to him because he was only 18 years old when he committed the robbery. The government now concedes that our caselaw bars the enhancement in this setting. We thus affirm Sanders's conviction but vacate his sentence and remand for resentencing.

I

Sanders, a northeast Ohio native, was friends with Otis Pamplin and "R.E.," a minor whom we will refer to by his initials. On July 10, 2018, R.E. spent the evening with Pamplin smoking marijuana in a Chrysler Pacifica that R.E. had stolen. While doing so, Pamplin claims to have noticed R.E. texting with Sanders about whether R.E. had obtained a car that they could use for something.

The next morning, R.E. and Pamplin arrived at Sanders's house in the Chrysler. A short time later that day, Sanders drove the three of them in this stolen car to the Ohio Savings Bank in Richmond Heights, Ohio. According to Pamplin, only upon arriving at the bank did he learn that R.E. and Sanders planned to rob it. Giving R.E. a gun, Sanders told R.E. and Pamplin to demand money from the bank employees while Sanders waited in the car as the getaway driver. R.E. and Pamplin put gloves on, covered their faces, and began to walk toward the bank. But, according to Pamplin, R.E. expressed a "bad feeling" about the robbery, so they called it off. (A bank security guard suggested that one of the would-be robbers saw her at the front door while she was locking it, which caused them to flee.) R.E. and Pamplin got back into the car and Sanders drove off.

They traveled a few miles to a branch of "LoanMax," a consumer lender in nearby Cleveland Heights. The plan at this new target was much the same as the plan at the old one: R.E. and Pamplin would enter and demand money while Sanders would wait in the car. R.E. would carry Sanders's gun and be the "enforcer"; Pamplin would collect the cash.

This time, they went through with the robbery. R.E. entered the LoanMax first, followed by Pamplin. Upon their entry, R.E. pointed the gun at a LoanMax employee (the sole person in the business) and told her to open the cash register. Pamplin, meanwhile, jumped over the counter.

When the employee opened the register, Pamplin emptied it of $128. Pamplin and R.E. ran back to the car, and Sanders sped away.

They did not make it far. By the first red light, the robbers spotted an approaching police cruiser. Sanders ran the red light and led the police on a high-speed chase for five to ten minutes. The chase ended when Sanders crashed the stolen Chrysler. Sanders, Pamplin, and R.E. fled on foot in different directions. Within minutes, officers caught Pamplin coming out of a backyard. Sanders successfully eluded police, but his escape was short-lived. The officers took Pamplin to the station, where he confessed and implicated Sanders and R.E. The following day, officers arrested Sanders near his home. At the time of the crimes, Sanders was just two months past his eighteenth birthday.

Sanders and Pamplin were indicted on four counts. The first two counts concerned the attempted armed robbery of the Ohio Savings Bank; the second two counts concerned the robbery of the LoanMax. For the LoanMax robbery, the government charged Sanders and Pamplin with Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a), and with brandishing a firearm during this robbery, in violation of 18 U.S.C. § 924(c)(1)(A)(ii). Pamplin pleaded guilty and testified against Sanders at trial. The jury found Sanders not guilty of the first two counts related to the Ohio Savings Bank, but it found him guilty of the two LoanMax-related counts.

At Sanders's sentencing hearing, he objected to a two-level sentencing enhancement for using a juvenile (R.E.) in the offense. *See* U.S.S.G. § 3B1.4. Sanders argued that the Sixth Amendment did not allow the district court to impose this enhancement because the jury did not find the necessary facts. The court overruled his objection because the enhancement did not result in a sentence above the statutory maximum after *United States v. Booker*, 543 U.S. 220 (2005). The court sentenced Sanders to 70 months' imprisonment for the Hobbs Act robbery. It next

3

imposed the mandatory-minimum sentence of 84 months for brandishing a firearm during the robbery—a term that was required to run consecutively to his other sentence. Sanders thus received a total of 154 months' imprisonment.

## II

Sanders raises two appellate arguments. He first argues that the government failed to present sufficient evidence to satisfy the Hobbs Act's commerce element. He next argues that the district court incorrectly applied the sentencing enhancement for using a juvenile in the robbery. He is wrong on the commerce claim but right on the sentencing claim.

## A

We review Sanders's sufficiency-of-the-evidence challenge to his Hobbs Act conviction without giving any deference to the district court. *See United States v. Potter*, 927 F.3d 446, 453 (6th Cir. 2019). Yet we give significant deference to the jury. *See id.* We may overturn Sanders's conviction only if the evidence would not permit a rational jury to find the essential elements of Hobbs Act robbery beyond a reasonable doubt. *See id.*; *see also United States v. Maya*, 966 F.3d 493, 498–99 (6th Cir. 2020). The Hobbs Act provides: "Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery . . . shall be fined under this title or imprisoned not more than twenty years, or both." 18 U.S.C. § 1951(a). This text requires the government to prove that Sanders committed a "robbery" and that the robbery "obstruct[ed], delay[ed], or affect[ed] commerce." *Id.*; *United States v. Ostrander*, 411 F.3d 684, 691 (6th Cir. 2005). Sanders does not dispute that a rational jury could have found that he participated in the LoanMax robbery and thus that the government offered enough evidence for the "robbery" element. He challenges only the government's evidence for

the "commerce" element—the one that distinguishes this federal crime from an ordinary robbery regulated by state law. *See Stirone v. United States*, 361 U.S. 212, 218 (1960).

The Hobbs Act defines "commerce" to cover not just commerce within federal territories or among the states, but also "all other commerce over which the United States has jurisdiction." 18 U.S.C. § 1951(b)(3). The Supreme Court has held that this "broad" language extends the Hobbs Act's scope to cover all conduct that Congress may regulate under its constitutional power over commerce among the states. *Taylor v. United States*, 136 S. Ct. 2074, 2079 (2016); *see* U.S. Const. art. I, § 8, cl. 3. To determine the Hobbs Act's outer limits, then, courts must examine the Supreme Court's Commerce Clause jurisprudence. *See Taylor*, 136 S. Ct. at 2079. Generally speaking, the Court has upheld Congress's power to regulate an economic activity (such as the intrastate "sale of marijuana") if that activity has a substantial effect on interstate commerce when considered in the aggregate (such as all intrastate marijuana transactions). *Id.* at 2079–80. That is true even if the one instance of the economic activity has only a minimal effect on interstate commerce. *Id.*; *see also Gonzales v. Raich*, 545 U.S. 1, 22 (2005).

That said, the Supreme Court has applied this "substantial effects" test only to activity that "is economic in nature." *Taylor*, 136 S. Ct. 2079–80 (quoting *United States v. Morrison*, 529 U.S. 598, 613 (2000)). Our caselaw thus distinguishes the robbery of a business engaged in commercial activity from the robbery of an individual. *Compare United States v. Vichitvongsa*, 819 F.3d 260, 270–72 (6th Cir. 2016), *with United States v. Wang*, 222 F.3d 234, 238–40 (6th Cir. 2000). To prove the commerce element for business robberies, we require only "a *de minimis* connection" to interstate commerce. *United States v. Watkins*, 509 F.3d 277, 280 (6th Cir. 2007).

A few examples show the minimal connection that suffices in this business context. The robbery of a Chattanooga bar satisfied this commerce element because the bar bought alcohol from

a Georgia distributor and served Atlanta customers. *United States v. Davis*, 473 F.3d 680, 683–84 (6th Cir. 2007); *see also United States v. Smith*, 182 F.3d 452, 456 (6th Cir. 1999); *United States v. Brown*, 959 F.2d 63, 68 (6th Cir. 1992). Likewise, the robbery of a Little Caesars in Cleveland sufficed because the store purchased its flour from Minnesota, its pizza sauce from California, and its cheese from Wisconsin. *See United States v. Baylor*, 517 F.3d 899, 903 (6th Cir. 2008); *see also United States v. Hughes*, 562 F. App'x 393, 398–99 (6th Cir. 2014). Similarly, the robbery of a Family Dollar Store's cash register satisfied the commerce element because this Memphis store sold goods originating from outside Tennessee. *United States v. Frazier*, 414 F. App'x 782, 782–83 (6th Cir. 2011). Lastly, and perhaps most relevantly, the robbery of a Columbus check-cashing business met this element because the business drew checks on—that is, received funds from—banks operating across the country. *See Watkins*, 509 F.3d at 281; *see also United States v. McComb*, 249 F. App'x 429, 435 (6th Cir. 2007).

When judged against this precedent, the interstate-commerce evidence in Sanders's case sufficed to meet the Hobbs Act's commerce element. The LoanMax in Cleveland Heights is a branch of an interstate business with locations in several states. This business lends money to consumers and uses their vehicles as the collateral. The specific LoanMax that was robbed effectively makes interstate loans because the funds that its customers receive come from Integrity Funding Ohio, a lender in Greenville, South Carolina. And the money that Sanders stole from the cash register came from customers repaying these interstate loans. Employees would use some of these cash-register funds to make change for customers or buy supplies. Yet once the amount in the register exceeded $200, they would deposit the excess in a safe to be picked up by a Loomis armored car. So some cash-register funds eventually made their way into LoanMax's corporate coffers, which the company could then use to repay Integrity Funding for its interstate loans to

consumers. This evidence would permit a rational jury to find that Sanders's robbery "obstruct[ed]" or "affect[ed]" the interstate loans, which qualify as "commerce over which the United States has jurisdiction." 18 U.S.C. § 1951(a), (b)(3).

Indeed, Sanders's case resembles our other cases that have upheld Hobbs Act convictions. Just as the robbery of a check-cashing business affected commerce because the business cashed checks using money provided by out-of-state banks, Sanders's robbery affected commerce because the specific LoanMax branch lent funds using money provided by an out-of-state lender. *See Watkins*, 509 F.3d at 281. And just as the robbery of a Family Dollar Store's cash register affected commerce because the store sold interstate goods, so too the robbery of a LoanMax cash register affected commerce because the business sold interstate loans. *See Frazier*, 414 F. App'x at 783; *see also McComb*, 249 F. App'x at 435.

Sanders responds that the robbery did not cause the LoanMax to close or prevent it from paying off (or engaging in) any specific interstate loan. He overstates the legal requirements for the Hobbs Act's commerce element. Our cases hold that the robbery of a business engaging in interstate transactions meets the Hobbs Act's commerce element without requiring proof that the robbery stopped a specific interstate deal. When upholding the defendant's conviction for the Little Caesars robbery, for example, we did not require proof that the robbery prevented the store from making an interstate purchase of pizza sauce. *See Baylor*, 517 F.3d at 903. It was enough that the store engaged in this type of interstate commerce. *See id.* That conclusion follows from the Hobbs Act's language. The statute requires the robbery to *obstruct*, *delay*, or *affect* commerce; it does not require the robbery to *prevent* commerce outright.

Sanders next suggests that the evidence did not suffice because he stole only a small amount—$128. Yet we have previously affirmed a Hobbs Act conviction for the robbery of $300

from a hotel that served out-of-state guests. *See Frazier*, 414 F. App'x at 783. We fail to see why Sanders's robbery should be any different. A rational jury could find that by depleting LoanMax's assets (even if only minimally), the robbery impeded its ability to extend interstate loans to other customers or to pay off Integrity Funding for the interstate loans that it had already issued. *See McComb*, 249 F. App'x at 435. In sum, our caselaw leaves no doubt that the government presented sufficient evidence to satisfy the Hobbs Act's commerce element.

B

Sanders's sentencing claim is another matter. Before imposing a sentence, a district court must calculate the defendant's guidelines range under the Sentencing Guidelines. *See Molina-Martinez v. United States*, 136 S. Ct. 1338, 1345 (2016). The court's misapplication of a guideline can render its ultimate sentence procedurally unreasonable and necessitate a resentencing that starts with the properly calculated range. *See United States v. Riccardi*, 989 F.3d 476, 481 (6th Cir. 2021). Sanders seeks such a resentencing here, arguing that the district court mistakenly enhanced his sentence under U.S.S.G. § 3B1.4 for involving R.E., a juvenile, in the robbery.

Section 3B1.4 provides: "If the defendant used or attempted to use a person less than eighteen years of age to commit the offense or assist in avoiding detection of, or apprehension for, the offense, increase [the defendant's base offense level] by 2 levels." *Id.* This sentencing enhancement grew out of a congressional command in the Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796. That law directed the Sentencing Commission to "promulgate guidelines or amend existing guidelines to provide that a defendant 21 years of age or older who has been convicted of an offense shall receive an appropriate sentence enhancement if the defendant involved a minor in the commission of the offense." *Id.* § 140008, 108 Stat. at 2033. On appeal, Sanders argues that § 3B1.4 conflicts with this federal law because

the law directed the enhancement to apply to defendants who are over 21, but § 3B1.4 covers all defendants regardless of age (including the 18-year-old Sanders).

We would ordinarily review this issue de novo. *See, e.g.*, *Riccardi*, 989 F.3d at 481. Yet Sanders did not raise this argument in the district court; he argued only that the enhancement could not apply under the Sixth Amendment. The government thus contends that we should review his challenge for plain error. *See, e.g.*, *United States v. Doxey*, 833 F.3d 692, 709 (6th Cir. 2016); *United States v. Bostic*, 371 F.3d 865, 871 (6th Cir. 2004). Sanders counters with caselaw allegedly showing that his constitutional argument against § 3B1.4 sufficed to preserve his statutory argument too. *See United States v. Hamm*, 952 F.3d 728, 741–43 (6th Cir. 2020); *United States v. Miller*, 161 F.3d 977, 984 (6th Cir. 1998). Ultimately, we need not resolve this standard-of-review debate because the government concedes that Sanders's sentencing challenge must succeed even under the plain-error standard. That standard requires Sanders to establish that the district court erred by applying § 3B1.4's enhancement to him, that this sentencing error was obvious, that the error affected Sanders's substantial rights, and that the error seriously affected his sentencing's fairness, integrity, or public reputation. *See Molina-Martinez*, 136 S. Ct. at 1343.

As the government concedes, the district court obviously erred under our precedent by applying § 3B1.4 to Sanders. *See United States v. Butler*, 207 F.3d 839, 851 (6th Cir. 2000) (Jones, J., concurring). The controlling concurrence in *Butler* (written by Judge Jones and joined by Judge Cole) held that this guideline could not apply to defendants like Sanders who are under 21 years old because that application would conflict with the federal law's "clear Congressional directive" to limit the enhancement to those over 21. *Id.* at 850. (Judge Clay's lead opinion would have rejected this argument, but he wrote only for himself on this issue. *Id.* at 844–46 (lead opinion).) After *Butler*, we have noted that the concurrence constitutes a "square holding" of our court.

9

*United States v. Borkowski*, 21 F. App'x 345, 346 (6th Cir. 2001) (per curiam). *Butler* thus suffices to show that Sanders satisfies the first two elements of the plain-error test.

As the government next concedes, a pair of Supreme Court cases show that Sanders can satisfy the two remaining plain-error elements. In *Molina-Martinez*, the Court held that, "in the ordinary case," an incorrect guidelines calculation will suffice by itself to establish an effect on a defendant's substantial rights. *See* 136 S. Ct. at 1347. In *Rosales-Mireles v. United States*, 138 S. Ct. 1897 (2018), the Court extended *Molina-Martinez* by holding that, "[i]n the ordinary case," an incorrect guidelines calculation will also "seriously affect the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 1911. Here, the government agrees that Sanders's case is an ordinary one that falls within the rules established by *Molina-Martinez* and *Rosales-Mireles*.

For these reasons, we affirm Sanders's conviction but vacate his sentence and remand his case for resentencing.