NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0302n.06

No. 13-1449

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Apr 23, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| JAMES LEGENZOFF, | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| Plaintiff-Appellee, | ) | |
| v. | ) | |
| MICHAEL STECKEL, et al, | ) | |
| | ) | OPINION |
| Defendants-Appellants. | ) | |
| | ) | |

BEFORE: McKEAGUE and STRANCH Circuit Judges; and COLLIER, District Judge.[*]

McKEAGUE, Circuit Judge.

Appellant-Defendants Michael Steckel and Michael Wells appeal the district court's denial of their motions for summary judgment on qualified immunity grounds. The district court denied summary judgment after determining that an unduly suggestive photo array tainted the witness identifications necessary to establish probable cause as required by the Fourth and Fourteenth Amendments. We conclude that Steckel and Wells had probable cause to seek an arrest warrant and did not influence the decision to prosecute. Because Steckel and Wells' conduct did not violate the Constitution, they are entitled to qualified immunity, and summary judgment is appropriate. We therefore **REVERSE** the district court and hold that Appellant-

_____

[*]The Honorable Curtis L. Collier, United States District Judge for the Eastern District of Tennessee, sitting by designation.

Defendants Steckel and Wells are protected by qualified immunity and entitled to summary judgment.

## I.

In the summer of 2007, police in the city of Warren, Michigan started to receive reports of a string of larcenies. The crimes involved a similar *modus operandi*. An elderly gentleman, later nicknamed by the media "the Suave Senior," would gain access to the victims' homes by posing as a neighbor or a friend. Once inside, he would ask for a cup of coffee, excuse himself to use the restroom, and then proceed to steal money or personal affects. The victims described the suspect as a white male in his seventies with white-gray hair, weighing 170 pounds and standing about 5' 10" in height.

Nearly one year later, on approximately August 20, 2008, the police in nearby Canton, Michigan received a larceny complaint from Lyle and Victoria Whipple. The Whipples stated that a few weeks prior to the larceny, a 5' 10" heavyset male named "George" had approached them outside of a grocery store and engaged them in conversation. Two weeks later, "George" appeared at the Whipple home and claimed to be a neighbor. Only Lyle Whipple was home at the time. While at the house having a cup of coffee, "George" excused himself to use the restroom. Later that evening, after Victoria Whipple returned home, the couple discovered that several hundred dollars had been stolen.

The Canton Police received a second larceny complaint on September 19, 2008 from Robert and Marie Temple. A stranger, who identified himself as a neighbor named "Chester Morton," gained entrance to the apartment under the auspices of having a cup of coffee and then stole money after excusing himself to use the restroom. Robert Temple discovered the theft and

phoned the police after "Chester" left. The Temples described the thief as an older white male, dressed nicely, and approximately 5' 7" in height and weighing 170 to 180 pounds.

Following the Whipple and Temple thefts, Canton Detective Michael Steckel ("Steckel") posted a message on the Law Enforcement Information Network describing the two thefts and seeking information about similar incidents. Sergeant David Centala of the St. Clair Shores Police Department responded to the post and indicated that similar cases had occurred in Macomb, Warren, and St. Clair Shores. The St. Clair Shores Police Department had identified James Legenzoff as a suspect, but had not been able to pursue the case further because of the age, health, and death of the witnesses. Sergeant Centala further noted that Legenzoff's business, involving the sale of coffee, took Legenzoff through Canton and Wayne Counties.

Based upon the tip that Legenzoff might be a possible suspect, the Canton Police used the Court and Law Enforcement Management Information System to create a photo array, which included head shots of Legenzoff and five random older white men with grayish-white hair. The men in the photo array are wearing a t-shirt, a tank top, and a hoodie; one man is shirtless; and Legenzoff and one other individual are shown in collared shirts. Importantly, Legenzoff's photo in the array had a blue background because it was taken from his driver's license photo. The backgrounds for the other individuals were varying shades of gray.

On September 23, 2008, Canton Police Detective Michael Wells ("Wells") showed this photo array to the Temples. Shortly after looking at the array, Robert Temple identified Legenzoff and indicated that he was "100% positive" as to his selection. Marie Temple also quickly identified Legenzoff and expressed her complete conviction in the selection.

Around this same date, Detective Wells independently met with Lyle Whipple and showed him the same photo array. Lyle Whipple pointed to photo #2, which contained the photo

3

of Legenzoff, and indicated that this looked like the suspect but that he was not completely positive, as he had been tired during his encounter with Legenzoff. The following day, Detective Wells showed the same photo array to Victoria Whipple. While Victoria Whipple had not been present at the time of larceny, she had met "George" two weeks prior during the grocery store encounter. After identifying Legenzoff, she indicated that she was absolutely positive in her identification. Lyle Whipple, who was present at the time of his wife's identification, indicated that he was about 80% positive that photo #2 was Legenzoff, and expressed his belief that he would be able to identify Legenzoff if he saw him in person.

Canton Police subsequently sought arrest warrants for Legenzoff for the Temple and Whipple larcenies. The Whipple warrant was denied because there was "nothing to show [Legenzoff] took the money." R.71-28, Wayne Cnty. Prosecuting Attorney's Recommendation at 3, PageID # 1842. But a warrant for the Temple larceny was granted on October 4, 2008, and Legenzoff was arrested for the Temple crime on October 14, 2008. Legenzoff later surrendered himself for arrest on the Whipple crime. Ultimately, however, the Temple and Whipple cases against Legenzoff fell through and the charges against him were dismissed.

On April 4, 2011, Legenzoff filed a 42 U.S.C. § 1983 complaint against the officers and municipalities. He alleged that they had unlawfully arrested him, maliciously prosecuted him, and used unduly suggestive identification procedures. Legenzoff later abandoned his claims against the municipalities. Steckel and Wells filed a motion for summary judgment, arguing that they were protected by qualified immunity.

The district court granted in part and denied in part the motion. The court granted the motion for summary judgment regarding the unduly suggestive identification procedure claim, holding that the "right to be free from unduly suggestive identification procedures is not a

substantive due process right." R. 82, Op. and Order at 12, PageID # 2512. Legenzoff has not appealed this adverse determination, and therefore, we do not address it here.

The district court denied, however, Steckel and Wells' motion for summary judgment on the unlawful arrest and malicious prosecution claims. The court determined there was a disputed question of fact regarding whether Steckel and Wells used a color photo array or a black-and-white array.[1] According to the court, the use of a color array would have highlighted the fact that Legenzoff's background was a different color from that of the other individuals. The court also noted that Legenzoff's hair and clothing were different from those of the other individuals. The district court determined that a jury could find that these discrepancies taken together—the different background, the different hair color, and the distinct clothing—made the photo array suggestive and possibly tainted the identifications, which were necessary to establish probable cause. Therefore, because there was a genuine dispute of material fact regarding which photo array was used, the district declined to extend summary judgment on the basis of qualified immunity.

This appeal from Steckel and Wells followed.

## II.

This Court reviews determinations of summary judgment *de novo*. *See Minadeo v. ICI Paints*, 398 F.3d 751, 756 (6th Cir. 2005). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled

---

[1] The parties disputed with some vigor before the district court whether Wells presented a color photo array or a black-and-white photo array to the witnesses, and in the event that both arrays were shown, the parties strongly contested the order in which the arrays were presented. The Appellants have conceded for the purpose of this appeal that the witnesses were shown a color photo array and that it was shown first.

to judgment as a matter of law." Fed. R. Civ. P. 56(a). Facts must be viewed "in the light most favorable to the non-moving party." *Flagg v. City of Detroit*, 715 F.3d 165, 178 (6th Cir. 2013).

Qualified immunity played a key role in the district court's summary judgment determination. The doctrine of qualified immunity provides government officials with "immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). This protection, which applies to suits brought under § 1983, balances two competing goals: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

As the Supreme Court has indicated, however, "[t]he qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (internal citation and quotation marks omitted). This Court reviews a district court's denial of qualified immunity in a § 1983 action *de novo*. *McCullum v. Tepe*, 693 F.3d 696, 699 (6th Cir. 2012).

### A. Interlocutory Appellate Jurisdiction

The district court's denial of qualified immunity is appealable under the collateral order doctrine in 28 U.S.C. § 1291. *See Mingus v. Butler*, 591 F.3d 474, 479 (6th Cir. 2010). This Court has "held that 28 U.S.C. § 1291 [cannot] serve as the basis for appellate jurisdiction for appeals from qualified immunity denials to the extent that those appeals took issue with the district court's determination that there existed a genuine issue of fact for trial." *Gregory v. City of Louisville*, 444 F.3d 725, 742 (6th Cir. 2006) (citing *Johnson v. Jones*, 515 U.S. 304, 313 (1995)). Therefore, this Court will only review pure issues of law, and treat mixed questions of

fact and law as questions of law. *See Gregory*, 444 F.3d at 743; *Gardenhire v. Schubert*, 205 F.3d 303, 312 (6th Cir. 2000). In other words, if there is a genuine issue of material fact that resulted in the denial of qualified immunity and summary judgment, the factual dispute is reserved for a jury and is not immediately appealable. *See Crockett v. Cumberland College*, 316 F.3d 572, 578 (6th Cir. 2003).

The district court determined that there was a triable issue of fact regarding whether a color photo array was used and whether it was used prior to a black-and-white photo array.[2] Such an issue of material fact would typically bar interlocutory review by this Court. Appellants, however, have conceded for the purpose of this appeal that the color photo array was employed first, which effectively eliminates the triable issue of fact from the case. *See Mingus*, 591 F.3d at 479 (permitting appellate review of an alleged constitutional violation for purposes of a qualified immunity inquiry, despite the district courts finding of a genuine issue of material fact, because the appellant "conceded the facts in the light most favorable to [the appellee] and therefore raised a *pure issue of law*") (emphasis added); *Harrison v. Ash*, 539 F.3d 510, 517 (6th Cir. 2008) (same). As there is no longer an issue of fact, this Court is presented only with a pure issue of law regarding the sufficiency of the evidence for probable cause. This court therefore has jurisdiction to hear this appeal. *See Hale v. Kart*, 396 F.3d 721, 728 (6th Cir. 2005) ("When no material dispute of fact exists, probable cause determinations are legal determinations that should be made by a court.").

---

[2] The district court indicated that "there is a genuine dispute of material fact regarding which array was first administered," R. 82, R. 82, Op. and Order at 9, PageID # 2513, but as the officers have conceded this point for purposes of this appeal, we are at a loss as to what other "genuine issues" exist stripping us of jurisdiction as the dissent suggests.

**B. Qualified Immunity**

Qualified immunity is assessed using a two-step sequence: "First, a court must decide whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right . . . Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). The Supreme Court has clarified, however, that this procedure is a not a strict order of battle and that "courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 242. If a court determines that a constitutional right is not "clearly established," the court need not make out a constitutional violation for qualified immunity to apply. *Id.*

**1. The Unlawful Arrest Claim**

We begin with the second prong of the qualified immunity test, whether the constitutional rights at issue were "clearly established." *Id.* "This inquiry turns on the *objective* legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Id.* at 244 (emphasis added). Put otherwise, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001) *receded from by Pearson*, 555 U.S. at 223.

We first identify the constitutional rights at issue in this case. Legenzoff broadly argues that his unlawful arrest claim is supported by the Fourth and Fourteenth Amendments because "[a]ny arrest requires probable cause." Pl.'s Br. at 36. The Supreme Court has indicated that courts should not apply the test of "clearly established law" at this level of generality because it

"bear[s] no relationship to . . . objective legal reasonableness . . . [and because it] convert[s] the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (internal citation and quotation marks omitted).

In fact, the right at issue is whether it was "clearly established that the circumstances with which [the officers were] confronted did not constitute probable cause" for purposes of the Fourth Amendment.[3] *Id.* at 640. Put differently, we are assessing whether it was clearly established that a reasonable officer would not find probable cause where several eyewitness identified a defendant using a possibly suggestive photo array. We first assess the arguments in favor of a finding of probable cause and then the arguments against it under a totality-of-the-circumstances analysis. Applying this standard to these particularized circumstances, we cannot

---

[3] Our discussion here differs from the dissent's analysis. The dissent discusses in its probable cause analysis whether the color photo array was suggestive and therefore contributed to a finding of probable cause, and references decisions, such as *Neil v. Biggers*, 409 U.S. 188, 198 (1972), which control whether a photo lineup and witness identification can be used as evidence *at trial*. The inquiry here, however, focuses on a pre-trial finding of probable cause, and as this circuit has stated, "evidence that supports probable cause for an arrest is not always admissible at trial." *United States v. Washam*, 468 F. App'x 568, 582 (6th Cir. 2012); *see Illinois v. Gates*, 462 U.S. 213, 256 (1983). Following our sister circuits, we do not find that it is necessary for our present analysis to formally incorporate into our probable cause discussion the *Bigger*'s framework, which is commonly employed for the admissibility of witness identifications at trial. *Compare Robinson v. Cook*, 706 F.3d 25, 34 (1st Cir. 2013) (declining to apply the *Bigger*'s framework to a probable cause assessment in a § 1983 case alleging unlawful arrest); *Standsbury v. Wertman*, 721 F.3d 84, 91 (2nd Cir. 2013) (same); *Phillips v. Allen*, 668 F.3d 912, 914–15 (7th Cir. 2012) (same); *Good v. Curtis*, 601 F.3d 393, 398 (5th Cir. 2010) (similar); *with Gregory v. City of Louisville*, 444 F.3d 725 (discussing the *Bigger*'s framework generally in the context of a one-on-one show-up analysis, not in the context of a probable cause determination). This is not to say that the court is turning a blind eye to potentially suggestive police procedures. These are still "relevant considerations in the totality-of-the circumstances analysis that has traditionally guided probable cause determinations" and we do consider them. *See Gates*, 462 U.S. at 233; *Cook*, 706 F.3d at 34; *Allen*, 668 F.3d at 917. But this Court's analysis ultimately focuses on the issue of probable cause.

say that "in the light of pre-existing law the unlawfulness [was] apparent." *Id.* at 640. Therefore, the officers are protected by qualified immunity.

An arrest is constitutionally valid if "at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *United States v. Dotson*, 49 F.3d 227, 230 (6th Cir. 1995) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). The analysis takes into account the totality of the circumstances, and the standard does not require the more exacting precision of the beyond a reasonable doubt or the preponderance of the evidence standards. *Gates*, 462 U.S. at 233–34. Rather, the Supreme Court has emphasized that probable cause requires "only the probability, and not a prima facie showing, of criminal activity." *Id.*

In assessing probable cause, this Court has held that an eye witness identification and accusation, by itself, is sufficient to establish probable cause. In *Ahlers v. Schebil*, 188 F.3d 365, 371 (6th Cir. 1999), an inmate accused a police official of sexual assault. When the charges were later dismissed, the police official sought § 1983 damages alleging, among other things, that he had been arrested without sufficient probable cause. This Court rejected the claim noting that the victim's accusation, standing alone, was sufficient to establish probable cause. As this Court explained,

> A law enforcement officer is entitled to rely on an eyewitness identification to establish adequate probable cause with which to sustain an arrest . . . *An eyewitness identification will constitute sufficient probable cause unless, at the time of the arrest, there is an apparent reason for the officer to believe that the eyewitness was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection of the confrontation . . .* This comports with the general notion that, since eyewitnesses' statements are based

> on firsthand observations, they are generally entitled to a presumption of reliability and veracity.

*Id.* at 370 (internal citation and quotation marks omitted) (emphasis added). *Ahlers* clearly stands for the proposition that a *single* witness identification is sufficient to establish probable cause.

Both Marie and Robert Temple separately identified Legenzoff and stated that they were "100% positive" that he had robbed their house. The identification occurred mere days after they had been robbed, and both Marie and Robert Temple spent several minutes with Legenzoff, while he drank his coffee, and were able to closely observe him under good conditions during daylight hours. It should also be noted that their description of the suspect as being an elderly man with gray hair, approximately 5' 7" tall, and weighing 170 pounds, closely conforms to Legenzoff's actual height and weight. Under these circumstances—even if the photo array was flawed—there is no reason to doubt the Temples' identifications. They were reliable.

As to the Whipples' identification, approximately one month after being robbed, Lyle Whipple indicated that Legenzoff's photo looked like the suspect but stated that he was not positive. Subsequent to this, Victoria Whipple, who was absent at the time of the theft but who had previously met Legenzoff at a grocery store, selected Legenzoff's photo and expressed absolute conviction in her identification. Following this, Lyle Whipple, who had observed his wife's identification, stated he was about 80% positive concerning his identification of Legenzoff. While neither identification is ideal—particularly because Victoria Whipple was not present for the alleged crime and because Lyle Whipple may have been influenced by his wife's identification[4]—probable cause does not require perfection, and witness identifications are "entitled to a presumption of reliability and veracity." *Id.*; *see also Peet v. City of Detroit*,

---

[4] Legenzoff draws this Court's attention to the fact that Lyle Whipple was unable to identify Legenzoff in the preliminary exam in the courtroom and suggests that this raises questions concerning the validity of his initial identification. In assessing probable cause, we look at the "officer's knowledge at the time of an arrest." *Crockett*, 316 F.3d at 580.

11

502 F.3d 557, 564 (indicating that probable cause existed despite inconsistencies in the witnesses' statements and the fact that the identification occurred relatively quickly at night time). Moreover, here, the Whipples' identification is corroborated by the Temples' claim that a man, who looked like Legenzoff, employed a similar *modus operandi* to rob seniors.[5]

If an accusation by a single individual is sufficient to constitute probable cause, per *Ahlers*, it stands to reason that independent identification by two people, such as the Temples or the Whipples, would more than suffice, especially where the identifications are as strong as they are here.

Having determined that the eyewitness identifications support a finding of probable cause, we now look at the arguments against it. The district court and Legenzoff contend that a jury could find the witnesses were mistaken or failed to accurately identify Legenzoff because the photo array was suggestive. They offer multiple grounds for this claim, in particular that there are differences in the background, hair, and clothing of Legenzoff's photo and the other photos.[6] We address each of the district court's and Legenzoff's concerns, and then assess whether taken together, the discrepancies indicate that it was clearly established that there was not probable cause for arrest.

---

[5] The Temple corroboration is relevant to the probable cause determination for the Whipple robbery even if it would not have been permitted as evidence in court. *See Washam*, 468 F. Appx at 582.

[6] The district court also seemed to find compelling the officers' admission that it would be suggestive to show a witness the color array before the black-and-white array. Wells and Steckel have conceded for purpose of this appeal that the color array was shown before the black-and-white array. Moreover, the relevant question before this Court is not whether the officers' conduct violated their personal or departmental norms of conduct, but whether they violated the Constitution. *See Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992) (indicating that a police officer's conduct could violate a police department's internal policy or commonly accepted police practice without violating the Constitution). And finally, it should be recalled that the determination of probable cause is an "objective" test. *Pearson*, 555 U.S. at 232.

The district court's first concern regarded the background color used in the photo array. Legenzoff's photo has a blue background, while the background of the other photos in the line-up are varying shades of gray, two of which appear to have a slightly bluish tinge. Many circuit courts,[7] however, including the Sixth Circuit in unpublished opinions, have held that the use of a different background color is not by itself suggestive. *See United States v. McComb*, 249 F. App'x 429, 436–39 (6th Cir. 2007) (holding that "a darker hue or different colored background does not in [itself] create an impermissible suggestion that the defendant is the offender," where the defendant was in front of a green-colored background while the other photos used a blue background) (internal citation and quotation marks omitted); *United States v. Soto*, 124 F. App'x 956, 965 (6th Cir. 2005) (rejecting the argument that the photo was suggestive because the background was lighter and the defendant was wearing a white shirt while the others wore dark clothing).

The district court's second concern related to hair color. The district court contended that white hair was a key part of the description offered by the victims, and none of the other photos contained men with purely white hair. While Legenzoff's hair appears overall to be the whitest, the hair color of the men in the array ranges from grayish-black to several photos of men with

---

[7] *See United States v. Harris*, 636 F.3d 1023, 1026 (8th Cir. 2011) (holding that a variation in color between the defendant's background and the other photographs did not render the photo array suggestive); *United States v. Brennick*, 405 F.3d 96, 99–100 (1st Cir. 2005) (holding that a photo identification was not suggestive although the defendant's photo had a darker background than the other photos); *United States v. Mathis*, 264 F.3d 321, 333 (3d Cir. 2001) (holding that a "slightly darker" background "did not significantly contribute to the array's unnecessary suggestiveness"); *United States v. Burdeau*, 168 F.3d 352, 357 (9th Cir. 1999) (holding that a photo was not suggestive even though it was "darker than the rest" and the defendant had his eyes closed); *United States v. Gay*, 423 F. App'x 873, 877 (11th Cir. 2011) (finding that a photo array was not unduly suggestive even though the defendant's photo and complexion were darker than the other photos and the defendant was wearing a different type of shirt); *United States v. Knight*, 382 F. App'x 905, 907 (11th Cir. 2010) (holding an array was not unduly suggestive where the background differed slightly and the defendant had a slightly different complexion).

completely grayish-white hair, similar to Legenzoff. Further, according to the police reports, both the Temples and Whipples indicated the suspect had gray hair. Thus, rather than setting Legenzoff apart, the inclusion of photos of men with gray-white hair conformed to the description provided by the victims and likely made the identification of Legenzoff more difficult, thereby contributing to the reliability of the identifications.

The district court's third concern regarded clothing. Witness descriptions indicated that the suspect was nicely dressed. In the photo array, one man is wearing a t-shirt, one is wearing a tank top, one is wearing a hoodie, and one is shirtless, while Legenzoff and one other individual are shown in collared shirts. Given that only Legenzoff and the other individual could be characterized as "nicely dressed," the court concluded that the clothing also raised questions as to whether the photo array was tainted. Many cases, however, indicate that a photo array is not suggestive where only the defendant is dressed in clothing or has a personal attribute that is expressly referenced by a witness. *See United States v. Washington*, 714 F.3d 962, 968 (6th Cir. 2013) (holding that an array was not suggestive where several witnesses described the defendant as having blue eyes and the defendant was the only person in the photo array with noticeably blue eyes); *United States v. Peterson*, 411 F. App'x 857, 864–65 (6th Cir. 2011) (holding that an array was not suggestive even though the defendant was the only person in dark clothing, which was part of the description of the robber, and older than the other photographed persons).

Legenzoff echoes the district court's concerns regarding the background, hair color, and clothing and provides two additional arguments. He first contends that the identification procedures were not reliable because the witnesses were together when they were each shown the photos array. While the Temples were in the same room when they identified Legenzoff, they were not provided an opportunity to discuss the photo array, and they made their determinations

independently. Similarly, Lyle Whipple's first identification occurred when he was alone. While the identifications arguably might have been stronger if each had taken place in isolation from other potential witnesses, we cannot say that the conditions tainted the identifications, given the other indicia of reliability.

Legenzoff's second argument regards the alleged post-identification feedback. This feedback took the form of media reports, identifying Legenzoff as the "Suave Senior," and the fact that Detective Wells allegedly told Marie Temple *after* she identified Legenzoff in the photo array that there were other cases involving Legenzoff. Because all of this alleged feedback occurred after the witnesses had identified Legenzoff, there is no reason to believe it impacted their identifications.

Taken altogether, and viewed under the totality of the circumstances, only three attributes of the identification procedure might have affected the reliability of the photo array: (1) Legenzoff's photo included a different background from the other photos; (2) only Legenzoff and one other person in the array wore clothing that arguably matched the description of the clothing referenced by the witnesses; and (3) the witnesses were in the same room when they independently viewed a photo array. Legenzoff, however, has not cited to any case clearly indicating that a photo array taken under these conditions would not satisfy a probable cause determination.

The case that is closest in factual terms to the present one is *United States v. Brennick*, 405 F.3d 96, 99–100 (1st Cir. 2005), and it does not support the district court's conclusion that a different colored background, dissimilar hair, and distinct clothing would be suggestive. In *Brennick*, the First Circuit held that a photo array was *not unduly suggestive* despite the fact that the defendant's photo was obtained from an identification card, while four of the other

photographs were booking photographs; the defendant's hairstyle, forehead, and clothing differed from the other individuals; and the background of the defendant's photo was darker than some of the others. *Id.* As the First Circuit concluded, "[o]n the whole, there is a high degree of similarity" among the men and "[t]he array does not in any way draw suggestive attention to [the Defendant]." *Id.*

The district court distinguished *Brennick* on two grounds: first, that Legenzoff's clothing somewhat matched the witness identifications, whereas in *Brennick* the defendant was merely dressed differently from the other persons; and second, that the police in *Brennick* used a black-and-white photo array, whereas here a color array was used. But even assuming that *Brennick* is distinguishable, which is debatable, the fact that a highly similar photo array was ruled *not suggestive* and therefore reliable, highlights that this is at best a close call. Given these circumstances, we cannot say that the use of this photo line-up would taint the witness identifications, nor that the "contours of the right [were] sufficiently clear that a reasonable official would understand that what he [was] doing violate[d]" the determination of probable cause. *Anderson*, 483 U.S. at 640; *Thacker*, 328 F.3d at 260 ("Insofar as the question of probable cause here is a close one, reasonable officials could disagree as to whether probable cause existed . . . Thus, the defendant officers are entitled to qualified immunity . . . .").[8] And even if we were to find that the array was suggestive, "[w]e have recognized that it is inevitable that law

---

[8] The dissent dismisses our *Brennick* analysis out-of-hand arguing that "in other cases posing similar disparities, this court has decided that photo arrays were unduly suggestive" We cannot help but note, after reviewing the cases cited by the dissent, that none of them actually indicate that police officers presented with circumstances *actually* similar to those in this case lacked *probable cause* to make an arrest. Even if these cases did establish that there was a close question as to whether the police conduct was or was not permitted by the constitution, we still could not say that it was "clearly established" that the officer's conduct was unconstitutional. This is the question presented on appeal, not as the dissent suggests whether a reasonable jury might determine that there was insufficient probable cause.

enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable." *Anderson*, 483 U.S. at 641.

Thus, given the strength of the multiple witness identifications, and the minimal grounds on which Legenzoff's photo differed from the others, we cannot say it was clearly established that there was no probable cause for arrest, even despite the alleged infirmities in the photo array. And because we find the law was not clearly established, we decline to reach the issue of whether there is a violation of a constitutional right. For the aforementioned reasons, we find the officers should be afforded immunity for the unlawful arrest claim.

## 2. The Malicious Prosecution Claim

Malicious prosecution constitutes a separate cognizable constitutional claim and is distinct from a claim for unlawful arrest. *See Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010). To bring a claim for malicious prosecution, a plaintiff must satisfy four requirements. First, "the plaintiff must show that a criminal prosecution was initiated against the plaintiff and that the defendant made, influenced, or participated in the decision to prosecute." *Id.* (internal citation and quotation marks omitted). Second, the plaintiff must show a lack of probable cause for the prosecution. Third, the plaintiff must show a deprivation of liberty as a consequence of a legal proceeding. Fourth, the proceeding must have been resolved in the plaintiff's favor. *Id.* Wells and Steckel concede that the fourth element has been satisfied, but contest whether the three remaining elements have been met.

Turning to the first prong, Legenzoff argues that the officers influenced the decision to prosecute by manufacturing probable cause with the color photo array and by failing to inform

17

the prosecutor of the identifications' failings. This claim is not supported. "[A]n officer will not be deemed to have commenced a criminal proceeding against a person when the claim is predicated on the mere fact that the officer turned over to the prosecution the officer's truthful materials." *Sykes*, 625 F.3d at 314. But an officer may be held liable for "making materially false statements either knowingly or in reckless disregard for the truth to establish probable cause for an arrest." *Gregory*, 444 F.3d at 725. Here, the officers' investigation report indicated that the witnesses had identified Legenzoff, and there is no indication that any false information was conveyed.

Legenzoff argues that the officers failed to mention that the identifications were based on the color photo array, but both the court and the prosecution were aware that the array might have been in color. At the preliminary hearings held on January 9, 2009, Legenzoff's counsel specifically indicated that the photo arrays used by the police were in color, and witness testimony supported this claim. The court, nonetheless, found there was sufficient probable cause to bind Legenzoff over for the Temple theft. Again, on February 6, 2009, Legenzoff's counsel raised the issue of the color photo array, this time in greater detail:

> We have, I think from exhibit number one, what is clearly a suggestive photographic array . . . . And, I think when you look at that identification record, it's clear that, as she put it, one person jump out at her. The person with the shock of grey hair, who's in the middle, who's got the brightest photography. I think on this record, Your Honor, that that kind of identification, absent any corroboration, is insufficient even for purposes of probable cause.

R. 71-31, Page ID # 1908-09. And again, the court found that there was probable cause to bind Legenzoff over on the Whipple theft. Taken together, it is clear that the court and the prosecution were well aware of any alleged deficiencies in the identifications, and nonetheless believed that they satisfied the requirements of probable cause.

18

As no evidence has been presented that the officer's turned over untruthful materials or that they showed reckless disregard for the truth to establish probable cause, the first element of a malicious prosecution claim fails. We need not address the other elements of the claim, and we therefore conclude that there has not been a constitutional violation for malicious prosecution and the officers are entitled to qualified immunity.

## III.

For the foregoing reasons, we find that the denial of qualified immunity was improper and the appellants are entitled to summary judgment. We therefore **REVERSE** the district court's opinion regarding the denial of qualified immunity and **REMAND** for entry of summary judgment in favor of the appellants and for any further action consistent with this opinion.

**STRANCH, Circuit Judge, dissenting.**

The Supreme Court has not been shy about instructing appellate courts regarding their jurisdiction to hear an interlocutory appeal from the denial of qualified immunity. The Court has articulated necessary limitations on interlocutory appeals by expressly confining our jurisdiction to abstract issues of law concerning whether a complaint states a violation of a constitutional right and whether that right is clearly established. The constitutional grant at issue here—the Fourth Amendment right to be free from arrest without probable cause—is clearly established. The more particularized point at stake—whether an objectively reasonable police officer would know that he violates Fourth Amendment law if he uses an impermissibly suggestive photographic lineup to establish probable cause for an arrest—is also clearly established. No abstract issue of law remains to be determined.

The dispute presented by the defendants and resolved by the majority in this appeal rests solely on genuine issues of material fact. This court is not empowered to delve into issues of material fact or to review disputes over the sufficiency of the evidence to prove a violation of a clearly established constitutional right. The determination of those ultimate issues has been entrusted to the trier of fact, the court below or the jury, entities whose job it is to view the evidence and make credibility determinations regarding the parties involved. Because we lack jurisdiction and the appeal should be dismissed, I respectfully dissent.

## I. ANALYSIS

### A. *Johnson v. Jones* is the Keystone to Qualified Immunity

In *Johnson v. Jones*, 515 U.S. 304, 319–20 (1995), the Supreme Court held "that a defendant, entitled to invoke a qualified immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets

forth a 'genuine' issue of fact for trial."  A defendant's appeal is limited to questions presenting a

"purely legal issue [of] what law was 'clearly established.'"  *Id.* at 313.  The Supreme Court has

made this critical point repeatedly.  *See Ortiz v. Jordan*, 131 S. Ct. 884, 891–92 (2011); *Behrens*

*v. Pelletier*, 516 U.S. 299, 312–13 (1996).  In *Behrens*, the Court explained *Johnson* as holding

> simply, that determinations of evidentiary sufficiency at summary judgment are
> not immediately appealable merely because they happen to arise in a qualified-
> immunity case; if what is at issue in the sufficiency determination is nothing more
> than whether the evidence could support a finding that particular conduct
> occurred, the question decided is not truly "separable" from the plaintiff's claim,
> and hence there is no "final decision" under *Cohen* [*v. Beneficial Indus. Loan
> Corp.*, 337 U.S. 541 (1949)] and *Mitchell* [*v. Forsyth*, 472 U.S. 511 (1985)].  *See*
> [*Johnson*,] 515 U.S., at 313–318, 115 S.Ct., at 2156–2158.  *Johnson* reaffirmed
> that summary judgment determinations are appealable when they resolve a
> dispute concerning an "abstract issu[e] of law" relating to qualified immunity, *id.*,
> at 317, 115 S.Ct., at 2158—typically, the issue whether the federal right allegedly
> infringed was "clearly established," *see, e.g., Mitchell*, *supra*, at 530–535, 105
> S.Ct., at 2817–2820; *Davis v. Scherer*, 468 U.S. 183, 190–193, 104 S.Ct. 3012,
> 3017–3019, 82 L.Ed.2d 139 (1984).

516 U.S. at 313.  Supreme Court law also teaches that the right the official is alleged to have

violated must have been clearly established in a particularized sense:

> "'The contours of the right must be sufficiently clear that a reasonable official
> would understand that what he is doing violates [the] right.'  The relevant,
> dispositive inquiry in determining whether a right is clearly established is whether
> it would be clear to a reasonable officer that his conduct was unlawful in the
> situation he confronted."

*Brosseau v. Haugen*, 543 U.S. 194, 198–99 (2004) (internal citations omitted) (quoting *Saucier*

*v. Katz*, 533 U.S. 194, 201–02 (2001) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640

(1987))).  Here, the qualified immunity defense is raised to Legenzoff's Fourth Amendment

claims.

## B.  Clearly Established Law on Probable Cause for Arrest

Legenzoff brought claims under 42 U.S.C. § 1983 for arrest without probable cause and

malicious prosecution.  "Probable cause" is "reasonable grounds for belief, supported by less

than prima facie proof but more than mere suspicion." *Sykes v. Anderson*, 625 F.3d 294, 306 (6th Cir. 2010) (internal quotation marks omitted). A police officer has probable cause for an arrest when the facts and circumstances known to him would warrant a prudent person to conclude that an offense has been committed. *See Green v. Throckmorton*, 681 F.3d 853, 865 (6th Cir. 2012). Probable cause is also the essential element in a malicious-prosecution claim, which requires a plaintiff to show that: (1) he was prosecuted and that the defendants made, influenced, or participated in the decision to prosecute; (2) there was no probable cause; (3) the prosecution resulted in a deprivation of liberty; and (4) the criminal proceeding was resolved in the plaintiff's favor. *Sykes*, 625 F.3d at 308–09. The right to be free from arrest without probable cause was clearly established many years before the events at issue here. *Maryland v. Pringle*, 540 U.S. 366, 369–70 (2003); *Malley v. Briggs*, 475 U.S. 335, 340–41, 345 (1986); *Gerstein v. Pugh*, 420 U.S. 103, 111–12 (1975); *Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560, 564 (1971); *Beck v. Ohio*, 379 U.S. 89, 90–91 (1964); *Leonard v. Robinson*, 477 F.3d 347, 355 (6th Cir. 2007); *Thacker v. City of Columbus*, 328 F.3d 244, 260 (6th Cir. 2003); *Crockett v. Cumberland Coll.*, 316 F.3d 571, 579–80 (6th Cir. 2003); *Klein v. Long*, 275 F.3d 544, 550 (6th Cir. 2001); *Donovan v. Thames*, 105 F.3d 291, 297–98 (6th Cir. 1997).

Detectives Wells and Steckel of the Canton Township police department contend they are entitled to qualified immunity on both of Legenzoff's federal claims. They argue that they had probable cause to seek arrest warrants for Legenzoff in the Temple and Whipple cases based on identifications witnesses made after they reviewed a photographic lineup containing Legenzoff's photo.

To determine whether the detectives are entitled to qualified immunity for seeking the arrest warrants, the question is "whether a reasonably well-trained officer in petitioner's position

would have known that his affidavit [in support of the arrest warrant] failed to establish probable cause and that he should not have applied for the warrant." *Malley*, 475 U.S. at 345. If so, "the officer's application for a warrant was not objectively reasonable, because it created the unnecessary danger of an unlawful arrest." *Id.* To determine whether the police had probable cause to seek the arrest of Legenzoff, "we consider the totality of the circumstances and whether the facts and circumstances of which [the officers] had knowledge [when requesting the arrest warrant] were sufficient to warrant a prudent person . . . in believing . . . that the seized individual ha[d] committed . . . an offense." *Sykes*, 625 F.3d at 306 (internal quotation marks omitted). As long as the facts allow one narrative where "'a reasonable fact-finder could [determine that] no reasonable officer, mistaken or otherwise, could conclude there's probable cause,'" an officer is not entitled to qualified immunity. *Romo v. Largen*, 723 F.3d 670, 673–75 (6th Cir. 2013) (quoting the district court's opinion) (affirming a district court's denial of qualified immunity, despite the existence of a narrative where the jury could find probable cause, because the jury could discount the officer's interpretation of the facts and determine that no reasonable officer would have concluded there was probable cause).

An arrest based on a facially valid warrant approved by the court ordinarily provides a complete defense to a federal constitutional claim for false arrest. *Voyticky v. Village of Timberlake*, 412 F.3d 669, 677 (6th Cir. 2005). Thus, if Legenzoff is to prevail at trial, he must prove by a preponderance of the evidence that in order to procure the warrant, the detectives "knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create[d] a falsehood and such statements or omissions [we]re material, or necessary, to the finding of probable cause." *Sykes*, 625 F.3d at 305 (internal quotation marks omitted); *Hinchman v. Moore*, 312 F.3d 198, 205–06 (6th Cir. 2002). "If the affidavit contains

false statements or material omissions, we set aside the statements and include the information omitted in order to determine whether the affidavit is still sufficient to establish probable cause." *Sykes*, 625 F.3d at 305 (citing *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989) (citing *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978))).

### C. Clearly Established Law on Suggestive Photo Arrays

Caselaw clearly establishes that identifications of suspects obtained by the police using highly unreliable photo arrays cannot be the sole basis for probable cause. *See Gregory v. City of Louisville*, 444 F.3d 725, 743–46 (6th Cir. 2006); *Stansbury v. Wertman*, 721 F.3d 84, 90–91 (2d Cir. 2013). The Supreme Court has long held that, when evaluating whether a pretrial photographic lineup is unduly suggestive, "each case must be considered on its own facts," and "convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968) (construing a due process claim); *see also Perry v. New Hampshire*, 132 S. Ct. 716, 726 (2012); *Neil v. Biggers*, 409 U.S. 188, 197 (1972). Though *Simmons*, *Perry*, and *Biggers* considered suggestiveness in deciding whether lineups were admissible at trial, these and similar cases instruct police officers about the constitutional parameters they must obey to ensure that a photo array shown to an eyewitness does not taint the identification process. The majority undoubtedly agrees with this point given that it bases its analysis almost exclusively on lineup-admissibility cases. Maj. Op. at 9 n.3, 13–16. Because of this longstanding law, an objectively reasonable police officer would have been on notice long before Legenzoff's arrest in 2008 that a photographic lineup shown to eyewitnesses for the purpose of developing probable cause for an arrest may not be

24

"impermissibly suggestive" as defined by the Supreme Court nor may identifications resulting from such a lineup serve as the sole basis for probable cause.

"Where the reasonableness of an officer's actions hinge on disputed issues of fact, 'the jury becomes the final arbiter of . . . immunity, since the legal question of immunity is completely dependent upon which view of the facts is accepted by the jury.'" *Leonard*, 477 F.3d at 355 (quoting *Brandenburg v. Cureton*, 882 F.2d 211, 215–16 (6th Cir. 1989)). Here, the district court determined, under clearly established law and construing the evidence in the light most favorable to Legenzoff, that there were genuine issues of material fact for trial on whether Legenzoff was arrested without probable cause. Accordingly, our case falls squarely within *Johnson*—we lack jurisdiction over this interlocutory appeal because the only issue presented is whether the evidence was sufficient to demonstrate a violation of clearly established law. 515 U.S. at 319–20; *Romo*, 723 F.3d at 674.

### D. The Factual Record Supports the District Court's Decision

Understanding why the district court determined that genuine issues of material fact exist for trial on the false-arrest and malicious-prosecution claims requires a review of the factual record. To be clear, there are no "affidavits" signed by Detective Wells and Detective Steckel that were provided to the state prosecutors to support the requests for arrest warrants for Legenzoff in the Whipple and Temple larcenies. To serve the function of an affidavit in each case, the detective submitted a document entitled, "Investigator's Report," which provided "Details of Investigation." The Reports referred only to "the lineup" and "the photo line up" shown to the witnesses and certainly did not disclose that two lineups were shown: a color one and a black and white one. The Reports also lacked any description of "the lineup" and provided no information about the procedures the detectives used to create "the lineup."

Detective Steckel requested the first arrest warrant for Legenzoff in the Temple case on September 23, 2008. His Investigator's Report stated that the Temples identified the suspect as an unknown older white male, with gray hair and glasses, standing 5'7" and weighing 180 lbs. The Report stated: "Det Wells showed the complainants the lineup on 9-23-08. The complainants picked the defendant immediately out of box #2 and stated that they were 100 percent sure that was the subject in their house." The Report failed to include any information about the procedures used to show the lineup to the Temples.

From Detective Steckel's Report, the prosecutor could not have known whether the photographs used in the lineup shown to the Temples depicted individuals with characteristics similar to the suspect described by the Temples, such as the distinguishing feature that the suspect wore glasses. In fact, none of the photos in the lineup depicted individuals wearing glasses. The detectives did not create a lineup based on the Temples' descriptions of the suspect, but instead used the same lineup that had been created earlier for the Whipple larceny. The Whipples did not describe the suspect as wearing glasses.

On September 25, 2008, two days after Detective Steckel requested an arrest warrant in the Temple case from one prosecutor, Detective Wells requested an arrest warrant in the Whipple case from a different prosecutor. In that Investigator's Report, Detective Wells stated that the Whipples were approached outside a Kroger store by an older white male about two weeks before the larceny at their home and they spoke to him for a short time. On the date of the larceny, however, Mrs. Whipple was not at home and Detective Wells's Report failed to provide that information. Rather, his Report stated that Mrs. Whipple identified a photo in the lineup—Legenzoff's—as "the person who was in their home." But Mrs. Whipple could not have identified the suspect who entered the home because she was not present at the time of the

larceny. She chose Legenzoff's photo to indicate the person she had previously met at Kroger, though this distinction was not conveyed to the prosecutor. Detective Wells omitted from the Report that the 90-year-old Mr. Whipple reported that he was "really tired" when the larceny occurred, a fact that casts doubt on the reliability of Mr. Whipple's identification of the suspect. Detective Wells's Report also failed to inform the second prosecutor whether the lineup photographs depicted individuals with characteristics similar to the suspect described by the Whipples.

Both Reports did not reveal to the two prosecutors that five of the six photos in the lineup were of identical size and showed individuals with darker gray hair against gray backgrounds. The sixth, Legenzoff's photo, was smaller than the others and depicted his white hair against a bright blue background. Only Legenzoff's photo and one other in the lineup showed men who were neatly dressed, a trait Mr. Whipple had found particularly memorable. The other photos depicted younger men, three in disheveled clothing and one shirtless. Three other local police agencies trying to solve similar larcenies in which Legenzoff became the suspect were able to create photo lineups that were far less suggestive than this one. They used filler photos of mostly neatly dressed, older men with similar white hair color.

The record does not confirm that Detective Wells and Detective Steckel provided either the color lineup or the black and white lineup to the prosecutors when requesting the arrest warrants. Apparently unaware of the problems with the lineup identifications, one prosecutor agreed to seek an arrest warrant against Legenzoff in the Temple case. The other prosecutor denied the request to seek an arrest warrant in the Whipple case.

An initial preliminary examination in the Temple case was continued to allow further investigation by the defense. Immediately after this truncated court proceeding, Detective

Steckel approached Legenzoff and his lawyer outside the courthouse and told them that the police department had an additional charge to bring against Legenzoff. He was referring to the Whipple case. Detective Steckel asked Legenzoff to return to the courthouse for an arraignment and bond hearing, but he failed to inform Legenzoff and his lawyer that the second prosecutor had declined to seek an arrest warrant in the Whipple case. Nor does the record indicate that any new evidence linking Legenzoff to the Whipple larceny had been developed. Uninformed about these issues, Legenzoff complied with Detective Steckel's request.

On a later date, Legenzoff faced a preliminary examination in the Temple case, during which his counsel marked the color lineup as Defendant's Exhibit A. Upon being asked by the judge whether this color photo array was the actual photo lineup used, a third prosecutor who was handling the preliminary examinations stipulated that "[t]his is the actual photo array, Your Honor, correct." Defense counsel showed Exhibit A to Mrs. Temple and she confirmed that those were the photos from which she had identified Legenzoff. She also testified she felt more confident that she had picked the right person because Detective Wells told her there were other pending cases involving the same suspect. Mr. Temple, too, identified Exhibit A as the photo lineup from which he identified Legenzoff, specifically confirming that the detectives showed him the color lineup first.

During a later preliminary examination in the Whipple case, Mr. Whipple admitted he had vision problems and he was unable to identify Legenzoff in the courtroom, even though the judge allowed him to walk around the courtroom to look at people. Although Mrs. Whipple was not at home when the larceny occurred, she testified that she was certain Legenzoff was the suspect who stole from them.

Testimony during the preliminary examinations further confirmed that Mr. Temple and Mr. Whipple, having already identified a suspect from the photo lineup, remained in the room with their respective wives as the women reviewed the photo array and identified a suspect. Mr. Whipple reviewed the photo array a second time while his wife remained in the room after she picked a suspect.

At depositions in this case, each detective testified about the process used for creating lineups. In the Canton police department, an officer creates a six-person photo array using CLEMIS, a computer database shared by numerous Michigan localities. CLEMIS contains only booking photos, so when a lineup is to include a suspect for whom no booking photo exists, the suspect's driver's license photo, retrieved from the Secretary of State database, is used. The parameters necessary to create the lineup are inputted manually. Height, weight, age and hair color are all available parameters, but clothing is not, and the officer chooses the parameters for the lineup based on witness descriptions. The officer tries to obtain filler photos as similar to the suspect's photo as possible, but according to Detective Wells, a bright blue background—like those in driver's license photos—is distinctive. CLEMIS then creates a lineup with five booking photos; the suspect's driver's license photo is imported as the sixth photo. Before the lineup is printed, the officer in charge of the case is responsible for evaluating the lineup to make sure that it is not unduly suggestive. If the lineup is acceptable, the system prints both a color and a black and white version.

Detective Steckel and Detective Wells admitted that a color lineup utilizing a driver's license photo cannot be shown to witnesses before a black and white version because the color version is highly suggestive. Only if the witness first identifies someone on the black and white lineup may an officer then show the color version to the witness for identification confirmation

purposes. Detective Steckel further conceded that showing the color lineup before the witness states his or her level of certainty taints the identification. He also admitted that driver's license photos with color backgrounds "do stand out. . . . There's no denying it"; and he agreed the suggestiveness of such photos is obvious and common knowledge among police officers. He explained that all Canton police officers know through training and experience not to use color lineups that include driver's license photos. Detective Wells also conceded that a highly suggestive photo lineup could result in a misidentification.

The array here was created when the two detectives gave the photo lineup parameters to another officer, Brian Schultz, and asked him to create the lineup. Both detectives then failed to review the lineup before it was printed to ensure that it was not unduly suggestive. Detective Steckel reviewed only the printed versions and determined that only the black and white lineup was good enough to be shown first to a witness. He readily admitted that the color lineup was unduly suggestive if shown first and he assumed everyone would know that the color version could not be shown. Detective Steckel was not present, however, when any of the four witnesses reviewed the lineups containing Legenzoff's photo and he did not know that Detective Wells showed the color lineup first. He testified that, had he been the lead investigator on the Whipple case and known that the Whipples' identifications were made from the color lineup, he would not have sought a warrant in that case.

The witnesses' identifications of Legenzoff as the suspect in the larcenies were completely dependent upon the suggestive color photo array used. The police developed no other evidence tying Legenzoff to the larcenies.

Taking all of these facts in the light most favorable to Legenzoff, a reasonable jury might well determine that, if the prosecutors had been given all of this information, the Temple arrest

warrant would not have been issued and neither prosecution would have been instigated. As this court has said on more than one occasion, "the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible." *Wilson v. Morgan*, 477 F.3d 326, 334 (6th Cir. 2007) (quoting *Gardenhire v. Schubert*, 205 F.3d 303, 315 (6th Cir. 2007) (alteration omitted)); *Gregory*, 444 F.3d at 743 ("In a § 1983 action, the existence of probable cause is a question of fact."). The district court correctly determined that genuine issues of material fact existed for trial and that the detectives are not entitled to qualified immunity under clearly established law. *Johnson*, 515 U.S. at 319–20; *Malley*, 475 U.S. at 344–45; *Gregory*, 444 F.3d at 743–44. Because this case presents only a question of evidence sufficiency, this court lacks jurisdiction to hear an interlocutory appeal of the denial of qualified immunity. *Johnson*, 515 U.S. at 313, 319–20.

## II.  THE MAJORITY'S FRAMEWORK IS NOT CONSISTENT WITH *JOHNSON*

The majority grants qualified immunity to the defendants by dismantling the totality of the circumstances underlying the probable cause determination. It does this by considering in isolation only certain facts about the photo array—the background color, the hair color, the clothing differences—to make the case for why the photo lineup was not unduly suggestive. The cases cited by the majority, finding particular lineups not unduly suggestive, reached that conclusion because the photos were substantially similar or the differences between the photos were not stark, as they were here. *See, e.g.*, *United States v. McComb*, 249 F. App'x 429, 440 (6th Cir. 2007); *United States v. Ford*, 72 F. App'x 342, 348 (6th Cir. 2003); *United States v. Knight*, 382 F. App'x 905, 907 (11th Cir. 2010); *United States v. Brennick*, 405 F.3d 96, 99–100 (1st Cir. 2005). But in other cases posing similar disparities, this court has decided that photo arrays were unduly suggestive. *See, e.g.*, *Jells v. Mitchell*, 538 F.3d 478, 512–513 (6th Cir.

2008) (holding pretrial identification procedure was unduly suggestive, but concluding that the witness identification was nonetheless reliable); *Haliym v. Mitchell*, 492 F.3d 680, 704 (6th Cir. 2007) (same); *United States v. Crozier*, 259 F.3d 503, 510–12 (6th Cir. 2001) (same).

The point we can draw from all of these cases is that photo lineup suggestiveness is highly dependent on the facts of each case. By parsing both the lineup and the probable cause question into component parts viewed in isolation, the majority substitutes its view of the evidence for the district court's determination that a jury must decide the factual questions. The majority's own analysis demonstrates this error by undertaking a detailed factual inquiry that cannot reasonably be considered an evaluation of abstract issues of law.

Such an approach is not in keeping with controlling Supreme Court law. It violates the teaching of *Johnson* that "determinations of evidentiary sufficiency at summary judgment are not immediately appealable." *Behrens*, 516 U.S. at 313. The inquiry this court must undertake is whether the contours of the clearly established right not to be arrested without probable cause are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal quotation marks omitted). The question is not whether "the very action in question has previously been held unlawful." *Id*. (internal quotation marks omitted).

Here, the contours of clearly established law on probable cause, including the use of suggestive photo arrays, is sufficiently clear that reasonable officers would understand that what they were doing violated Legenzoff's Fourth Amendment rights. And unlike the question of admissibility of an in-court identification based on a suggestive lineup where the decision is exclusively within the judge's authority, the suggestiveness of a lineup is just one aspect of the totality of the circumstances analysis for probable cause in the qualified immunity context, and

whether there was probable cause is a question commonly left to a jury. Here, the suggestive photo array is only one flaw in this police investigation. The majority does not address other fundamental problems, such as that: the photo lineup did not match the witnesses' descriptions of the suspect; the officers' Reports submitted in support of the arrest warrants misstated and omitted important investigative facts pertinent to the prosecutors' decisions; and the detectives failed to develop any other evidence, beyond the lineup identifications, tying Legenzoff to the crimes. In addition, the record contains Detective Steckel's admission that the detectives' actions tainted the identification process. In light of all this evidence, defendants' minor concession on appeal that the color array was employed first during the witness identifications does not "effectively eliminate[] the triable issues of fact from the case." Maj. Op. at 7.

In a similar interlocutory appeal, this court held it lacked jurisdiction to review the district court's ruling that there were factual disputes requiring a trial. *See Gregory*, 444 F.3d at 743–44. This court agreed with the district court that a reasonable jury might find that a police officer had several reasons to believe a witness was mistaken in her identification of the suspect and that the officer lacked probable cause to arrest the plaintiff. *Id.* This circuit has also explained that the existence of one reasonable factual narrative supporting the existence of probable cause does not entitle an officer to qualified immunity where there are also other reasonable narratives under which no reasonable officer could conclude that probable cause existed. *See Romo*, 723 F.3d at 673–75. For the same reasons those cases were returned to the quintessential realm of the jury in both *Gregory* and *Romo*, this case should be returned to the district court as well.

If the analytical framework in the majority opinion were correct, it would leave few if any rights clearly established. That framework would impose upon this court the job of

considering whether the facts conclusively prove a violation of a clearly established right, leaving no question for the jury and ignoring the determination of the district court that disputes of material fact remain. Such an analysis is well beyond this court's jurisdiction to consider "neat abstract issues of law." *Johnson*, 515 U.S. at 316–17 (internal quotation marks omitted).

### III. CONCLUSION

*Johnson* explains the critical distinction between a proper interlocutory appeal addressing abstract questions of law and the non-appealable question of whether the evidence is sufficient to prove the violation of a clearly established constitutional right. 515 U.S. at 313–17. This court is presented with the latter case: the law on probable cause is clearly established, but genuine issues of fact exist to be tried on whether Legenzoff's rights were violated. Thus, the following statement in the majority opinion cannot be correct: "As there is no longer an issue of fact, this Court is presented only with a pure issue of law regarding the sufficiency of the evidence for probable cause." Maj. Op. at 7. This statement improperly mixes the concepts that *Johnson* teaches must be kept distinct in order to determine whether an interlocutory appeal is properly brought.

In sum, genuine issues of material fact remain. As determined by the district court, they are to be resolved by the jury—the entity charged with viewing all the evidence and making credibility determinations concerning the witnesses. Case law instructs us that interlocutory appeal is not the forum for resolving these issues. This appeal should be dismissed for lack of jurisdiction and because the majority concludes otherwise, I respectfully dissent.